[No. B162971. Second Dist., Div. Seven. Dec. 15, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ARZATE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I., II. and III. of the Discussion.

[redacted]

## COUNSEL

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Chung L. Mar and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, Acting P. J.**—Appellant, Jose Arzate, shot a sheriff's deputy who had stopped him for speeding. A jury convicted appellant of attempted willful, deliberate and premeditated murder of a peace officer, among other offenses, and found true the allegations he personally used a handgun and inflicted great bodily injury in the commission of the offense. The court sentenced appellant to 40 years to life in state prison on these findings. Appellant appeals, claiming the trial court erred in excluding evidence of third party culpability. He also contends there was insufficient evidence of concealment to sustain the conviction for having a concealed gun in his car.

Assuming there was evidence the gun was concealed, appellant argues the jury's true findings he personally used a firearm and inflicted great bodily injury in connection with the concealed gun charge must be stricken because the offense of carrying the concealed firearm ended when he displayed and used the gun, and thus did not occur "in the commission" of the offense. Finally, he argues the increased punishment on the attempted murder charge must be stricken because the jury failed to expressly find the attempted murder victim was a peace officer.

We agree with appellant it is logically inconsistent to inflict great bodily injury and use a gun "in the commission" of the offense of carrying a concealed firearm in a vehicle. Accordingly, we shall strike these jury's findings and the gun use enhancement imposed and stayed with regard to the gun concealment conviction. As so modified, we affirm.

## FACTS AND PROCEEDINGS BELOW

On Good Friday, April 13, 2001, Sheriff's Deputy Angel Dominguez was on traffic patrol in Norwalk. He was in full uniform and drove a black and white marked patrol car. Deputy Dominguez parked the cruiser in the parking lot of an industrial facility and watched for traffic violators from this blind off Norwalk Boulevard.

Just before 2:00 p.m., Deputy Dominguez spotted a vehicle traveling in excess of the posted speed limit of 35 miles per hour. He decided to pull the car over. The deputy moved into traffic lanes a few cars behind the violator. Deputy Dominguez eventually caught up to the car and flashed the cruiser's overhead lights. The driver parked at the curb and Deputy Dominguez stopped his cruiser behind him. The deputy got out of his police vehicle without running the car's license plates through the Department of Motor Vehicle's database.

The driver was alone in the car. The car's windows were rolled down. The driver's left arm was resting on the windowsill. Deputy Dominguez thought the driver was wearing a blue Los Angeles Dodgers baseball cap. As Deputy Dominguez approached the driver's door and started to lean into the vehicle, the driver swung his right hand around and shot the deputy. The shooting happened in an instant, before either man had said a word. Deputy Dominguez jerked back and fell into oncoming traffic. The driver immediately sped off.

Deputy Dominguez was momentarily paralyzed. He thought he had been shot in the face. Because of his movements Deputy Dominguez had instead sustained a through-and-through wound to his neck. At the hospital he

described the car as a light-colored, midsize car. He did not get the car's license plate number. A month after the shooting Deputy Dominguez looked at a photo array and selected one of the photos as the possible suspect.[1]

Two blocks away the driver apparently lost control of his speeding vehicle and crashed into and onto a curb on a residential street. He struggled with the steering wheel and/or gearshift until he was able to remove the car from the curb. Once freed from the curb he sped off down the street.

Two witnesses who saw the car speed off later informed investigators the car was a champagne-colored late-model Ford Focus.

Around 2:00 p.m. on April 13, 2001, Ms. Norma Zarate was inside her home when she heard the squeal of tires and then a crash. She ran outside to make sure her children, who were playing outside, were not hurt. Directly across the street, Ms. Zarate saw a man in a car which had crashed onto the curb. She observed his left profile as she watched him struggle with the car's steering wheel before he drove off. He had short shaved hair and was not wearing a hat.[2]

At trial, Ms. Zarate identified appellant as the man she saw sitting in the car which had crashed into the curb in front of her house. She had previously selected appellant's photo as the person in the car from a six-pack photo array. In identifying appellant's photograph Ms. Zarate stated, "I feel the person in the picture is the guy."

Just before 2:00 p.m. on April 13, 2001, Angela Grajeda was driving down Norwalk Boulevard returning to work after her lunch break. She noticed a patrol car pull into traffic and pursue a speeding car. The car was champagne colored with a spoiler on the rear. She thought the car might be a Maxima or an Accord. There was one person in the car. Ms. Grajeda watched in fascination as the patrol car pulled behind the speeding car, turned on its lights and directed the car to pull over. When her car was about 10 feet away from them, Ms. Grajeda "saw the man grab—reach down and grab a gun and shoot the officer." The officer fell back into her lane and she had to swerve to avoid hitting him. The shooter then drove off at a high rate of speed. He made eye contact with Ms. Grajeda as he drove past. She became very scared the shooter might hurt her. Ms. Grajeda parked her car and called 911.

---

[1] Later investigation revealed it was physically impossible for this person to have been at the shooting site at the time of the shooting. Approximately five minutes after the shooting this person's time card indicated he had clocked back in at his workplace in Alhambra which was more than 30 minutes driving time away.

[2] A defense investigator testified Ms. Zarate told him the driver of the car wore a blue Dodgers baseball cap. The prosecutor rebutted this testimony with evidence of a taped interview with Ms. Zarate shortly after the incident in which she reiterated, "he had no hat."

Officers took her to the station to help the sheriff's department's artist make a drawing of the shooter's face. Ms. Grajeda described the shooter as a Hispanic male in his mid-20's, with light skin and very short, slicked-back black hair. He wore a white shirt and wore no hat or cap on his head. For various reasons she could not or would not provide further details. Her husband, who was waiting for her at the station, warned Ms. Grajeda not to get involved. They had arguments about the matter to the point the parties had contemplated divorce. When later shown a six-pack photo array Ms. Grajeda stated she could not identify the shooter. She nevertheless selected two photos and stated if she had to choose she would pick appellant's photo. At trial, Ms. Grajeda testified she had not been wearing her glasses at the time and saw details too poorly to identify the shooter.

Around 2:00 p.m. on April 13, 2001, Good Friday, Maria Gordillo, and her siblings, Jose and Brenda Reyes, were walking down Norwalk Boulevard on their way to church. They walked by as a patrol officer stopped a speeding car. There was one person in the car and the windows were rolled down. As they walked passed, Maria Gordillo looked inside the car at the driver. A few paces beyond the car all three of them heard a shot. The car then sped off down the street. Jose, Brenda and Maria looked at the driver as the car passed them. They saw the driver's right profile.

Jose Reyes described the car as a tan or beige four-door which looked like a Honda. The sole occupant of the car was a male wearing a white T-shirt with a "fade" haircut, meaning shaved on the sides and longer on the top. At trial, Jose Reyes identified appellant as the man he saw. Shortly after the crime he selected appellant's photo from a photo array and stated, "I think No. 2 looks like the guy that shot the policeman." When shown a photo of the champagne-colored Ford Focus, Jose Reyes described the car in the photo as tan or brownish and likely a Toyota.

Brenda Reyes also selected appellant's photo from a photo array as the person she believed she saw drive past them after the shooting. By the time of trial, nearly a year and a half later, she was unable to make an in-court identification.

The oldest sibling, Maria Gordillo, testified she looked at the driver of the car through its open windows both before and after the shooting. She thought the car was a beige Honda Civic. Once the officer pulled the car over, Maria Gordillo looked inside the car through its open windows and saw the right profile of the driver's face. He was alone in the car and wore no cap or hat on his head. After the shooting she looked again as the car sped past them. A month after the shooting she selected appellant's photo from a photo array

and stated, "Number two is the guy that did it. It's the same hairstyle and the form of the head looks like the guy." She also identified appellant as the perpetrator at trial.

When shown a photograph of the champagne-colored 2001 Ford Focus Maria Gordillo testified it appeared similar to the car she saw the day of the shooting.

Based on these witnesses' descriptions of the shooter and his car, the media broadcasted reports stating law enforcement was looking for a gold- or tan-colored car resembling a Honda which had been involved in Deputy Dominguez's shooting.

Within a few weeks officers located the 2001 champagne-colored Ford Focus at a Budget Rent-A-Car on Rosecrans in Norwalk. It had right front wheel well and fender damage consistent with having collided with a curb-height structure. Debris lifted from the curb was consistent with the paint, primer, coating and metal from the damaged Ford Focus's aluminum wheel and fender. Swabbing of the car's interior revealed debris consistent with gunshot residue on the steering wheel and driver's side seat belt. Budget Rent-A-Car provided investigators copies of rental contracts for the Ford Focus.

The investigators did not update media broadcasts regarding their search for the car despite their confidence they had recovered the car used in the shooting.

Five days before the shooting, on April 8, 2001, appellant's friend, Ruben Rodriguez, asked appellant to use his Sears credit card to buy him a set of tires for his Ford Thunderbird. Appellant agreed. In return, appellant asked Rodriguez to rent him a car. Appellant called several car rental agencies on his cell phone before finally finding an open Budget Rent-A-Car on Rosecrans in Norwalk. Rodriguez signed the rental agreement for the champagne-colored, four-door, 2001 Ford Focus. Rodriguez used his credit card. Initially appellant stated he only wanted the car for a few days. He later asked, and Rodriguez agreed, to continue renting the car for another week. Appellant ultimately reimbursed Rodriguez for the full cost of the rental in cash.

Appellant, his "common law wife," Carmen Sandoval, and their children had been living with appellant's parents on Algardi Street in Norwalk. Appellant had lived in this house much of his life and had many friends and relatives in the neighborhood. Shortly after the shooting appellant drove to Jose Delgadillo's house, a friend who lived down the street. According to Delgadillo, appellant was driving a brownish Ford Focus. Appellant had a

baggie of methamphetamine on the car seat. They talked outside for a little while until appellant said he had to leave to drop off some methamphetamine. Delgadillo heard sirens and police helicopters 10 to 15 minutes after appellant left.

Appellant telephoned later in the day to ask whether Delgadillo knew of a place where he could hide a car. Appellant's "brother-in-law," David Sandoval, picked Delgadillo up and drove him to a motel in Whittier to meet with appellant. Motel records established Carmen Sandoval, appellant's "common-law wife," had rented the motel room for appellant around 3:20 p.m. that day.

While inside the motel room appellant told Delgadillo he "shot a cop" who had pulled him over. Delgadillo saw a handgun in the motel room.

Delgadillo made several telephone calls in an attempt to find a suitable location to hide a car. He called his former girlfriend, Rosie Escalera, who lived in Stanton in Orange County. In the meantime, appellant used his cell phone to call a tow truck operator. He directed the tow truck driver to pick up the Ford Focus from where it was parked alongside the highway and to bring it to Ms. Escalera's house in Stanton.

Appellant, Delgadillo and Sandoval drove to Ms. Escalera's house. While they were waiting outside the tow truck arrived with the Ford Focus. Ms. Escalera refused to allow the men to park the Ford Focus in her backyard. She also refused appellant's offers of cash to park the car in her backyard until the car could be fixed. Appellant paid the tow truck driver and drove the Ford Focus back to the motel in Whittier.

Days later appellant and Rodriguez picked up the Ford Focus from where it had been secreted a few blocks away from their homes. It had been parked in a garage off an alley which was not visible from the street. They returned the car to Budget-Rent-A-Car.

On May 4, 2001, Deputy Jeffrey Flotree was on routine patrol with his partner. Around midnight they saw Delgadillo walking down the street. The officers stopped to speak with him to find out what he doing out so late. Delgadillo agreed to talk but was concerned about being seen talking with the officers. Delgadillo got into the backseat of the patrol car. Regarding the deputy who had been shot, Delgadillo told Deputy Flotree "they were looking for the wrong car." He stated officers should instead be looking for "a rented Ford Focus." Delgadillo told Deputy Flotree the shooting occurred because the person stopped had a lot of drugs in the car and also had "some weapons charges against him." Delgadillo told the officer he was on parole and stated he believed it was good to help law enforcement when he could. He agreed to

be interviewed later by the investigating officers. Deputy Flotree immediately reported Delgadillo's information to the homicide division.

Investigating officers Detective Phillip Guzman and Sergeant Purcell interviewed Delgadillo a few days later at the station. Many of the officers' conversations with Delgadillo were tape-recorded and/or videotaped and played for the jury at trial. In their first conversation, Delgadillo explained he was on parole and stated he believed the information he could provide warranted expungement of his, as well as his brother's, criminal records. From the broadcasts he had heard, Delgadillo believed the detectives were looking for the wrong car. He told the officers they should instead be looking for a rented Ford Focus. Delgadillo explained he met with appellant at a motel the evening of the shooting. He refused to divulge appellant's name, except to say they shared the same first name. Delgadillo explained appellant shot the deputy because he had guns and a substantial quantity of drugs in the car and was then on parole for an arms offense. According to Delgadillo, appellant appeared very nervous because he had searched the car but could not find the shell casing. He wanted Delgadillo's help in finding a place to hide the car for a while.

Eventually Delgadillo received $5,000 of the offered reward money for his role in helping to arrest appellant. However, Delgadillo did not want his identity disclosed, did not want to testify in court, and was a very reluctant witness at appellant's trial.

Appellant presented an alibi defense at trial. Javier Martinez had known appellant since they were children. On April 13, 2001, appellant came to his house around noon. They did some methamphetamine together. A few hours later they heard sirens and police helicopters and went outside to watch. Appellant left his house sometime after 3:00 p.m. but before 4:30 p.m. His wife usually arrived home from work around 4:45 p.m. and Martinez did not want her to find them smoking dope.

Appellant's "brother-in-law," David Sandoval, confirmed many of the details of Delgadillo's testimony. He testified he drove Delgadillo to appellant's motel room around 8:30 p.m. to take methamphetamine and "party." Appellant did not say he had "shot a cop." Later that evening he drove appellant and Delgadillo to Rosie Escalera's house in Stanton. After a few minutes a tow truck arrived towing a brownish four-door car resembling a Honda. Appellant drove the car back to the motel. He and appellant were arrested together on May 11, 2001. When arrested David Sandoval denied he even knew appellant.

Appellant testified in his own defense. He testified Rodriguez rented him a Ford Focus from Budget Rent-A-Car on April 8, 2001. At noon on April 13,

2001, he lent the car to his friend Sal Garcia, now deceased. Garcia dropped him off at Martinez's house where they took methamphetamine and played on the computer. In the middle of his visit he heard police sirens and helicopters circling above. They went outside to see if they could discover the reason for all the commotion.

Later in the day he gave Carmen Sandoval money and asked her to rent him a room at a Days Inn motel in Whittier. In the evening Delgadillo and David Sandoval came to visit him at the motel. Later he arranged with Garcia to have a tow truck deliver the Ford Focus to an address in Stanton. Appellant said the car had to be towed because Garcia said it had stalled. Delgadillo suggested leaving the car at his ex-girlfriend's house in Stanton. Instead of leaving the car in Stanton, he drove the car back to the motel.

He lived in motel rooms until his arrest on May 11, 2001.

In rebuttal, the prosecution produced copies of appellant's cell phone records which established appellant had made several telephone calls to Martinez during the time he was allegedly at Martinez's home and in Martinez's presence.

A three-count information charged appellant with the willful, premeditated and deliberate attempted murder of a peace officer (Count I),[3] assault on a peace officer with a semiautomatic firearm (Count II),[4] and with carrying a concealed firearm in his vehicle (Count III).[5] The information further alleged as to all counts appellant inflicted great bodily injury on the victim.[6] Regarding gun use, Counts I and II alleged appellant personally and intentionally used a firearm,[7] and Count III alleged personal use of a firearm.[8] A jury convicted appellant as charged in Counts I and III and found true the related special enhancement allegations. In Count II the jury found appellant guilty of the lesser included offense of assault with a firearm on a peace officer and found true the related enhancement allegations.

Based on the allegations the victim was a peace officer and the attempted murder was willful, deliberate and premeditated, the trial court sentenced appellant to 15 years to life, plus an additional 25 years to life on the gun use allegation, for a total term of 40 years to life. The court imposed and stayed punishment on the remaining counts and allegations. Appellant appeals.

[3] Penal Code sections 664, subdivisions (e) and (f) and 187, subdivision (a).
[4] Penal Code section 245, subdivision (d)(2).
[5] Penal Code section 12025, subdivision (a)(1).
[6] Penal Code section 12022.7, subdivision (a).
[7] Penal Code sections 12022.53, subdivisions (b), (c) and (d) and 12022.5, subdivisions (a) and (d).
[8] Penal Code section 12022.5, subdivision (a)(1).

## DISCUSSION

### I.–III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV. *THE TRUE FINDINGS OF GUN USE AND GREAT BODILY INJURY ON THE CONCEALED FIREARM COUNT MUST BE STRICKEN.*

To recall, the jury found appellant guilty of carrying a concealable and concealed firearm in his car. In connection with this count, the jury further found true the allegations of having personally used the firearm[37] and of having personally inflicted great bodily injury.[38] Appellant argues the jury's true findings must be stricken.

Penal Code section 12022.5, subdivision (a) provides for a sentence enhancement where a defendant uses a firearm in the commission of the offense, "unless use of a firearm is an element of that offense." Use of a firearm is an "element of the offense" if it is "an essential component of the legal definition of the crime considered in the abstract."[39] Appellant argues concealing a gun in a car necessarily requires "use" of the gun and thus the true finding and sentence enhancement on this particular count was improper.

We cannot agree the act of concealing a handgun is synonymous with its use. Viewed in the abstract, the offense of having a concealed weapon is committed with the fact of possession of the weapon in a concealed or partially concealed fashion within a vehicle under the defendant's control or direction. The offense is thus more akin to being *armed* with a firearm than with using one. One is armed with a firearm "if the defendant has the specified weapon *available for use*, either offensively or defensively."[40] "Use" of a firearm, on the other hand, "connotes something more than a bare potential for use."[41] "Use" generally means " ' "to carry out a purpose or action by means of, to make instrumental to an end or process and to apply to

---

*See footnote, *ante*, page 390.

[37] Penal Code section 12022.5, subdivision (a)(1).

[38] Penal Code section 12022.7, subdivision (a).

[39] *People v. Read* (1983) 142 Cal.App.3d 900, 903 [191 Cal.Rptr. 305] (finding gun use enhancement proper because firearm use is not an element of the offense of involuntary manslaughter).

[40] *People v. Bland* (1995) 10 Cal.4th 991, 997 [43 Cal.Rptr.2d 77, 898 P.2d 391], italics added.

[41] *People v. Bland, supra,* 10 Cal.4th 991, 997.

advantage." . . . ' "[42] Thus, "use" of a firearm may involve displaying the gun, brandishing the gun, or actually firing the gun.

Because the offense of "carrying a concealed firearm" in a vehicle does not require any action on the defendant's part beyond merely having the gun *available* for use, we reject appellant's argument use of the gun is an element of the crime of carrying a concealed firearm in a vehicle and thus gun use enhancements on this offense are expressly prohibited by statute.

On the other hand, there is some question whether a person can *use* a firearm *in the commission* of carrying a *concealed* weapon or can *inflict great bodily injury in the commission* of carrying a *concealed* firearm in vehicle. The statutory requirement for true findings on these enhancement allegations dictates the gun use and infliction of injury occur "in the commission" of the underlying felony.[43] Conceptually the crime of concealment would seemingly end with the firearm's use and thus exposure. In other words, it seems logically inconsistent to be found guilty of both using the gun and inflicting injury while concealing the same gun within a vehicle.

The People refer this court to no reported decisions upholding true findings or sentence enhancements for gun use or the infliction of great bodily injury for illegal weapons possession or weapons concealment offenses. Instead, the People claim California courts have uniformly rejected "a narrow hairsplitting approach to determining the scope of criminal activity." In support of their position the People rely on decisions discussing the phrase "in the commission of the offense" in the context of crimes such as felony murder, burglary, robbery, kidnapping and the like.[44]

However, as noted, the offense of carrying a concealed firearm in a vehicle is committed with the single passive act of carrying the firearm in a concealed fashion in a vehicle. In contrast, crimes such as felony murder, burglary, robbery and kidnapping involve affirmative actions, even beyond

---

[42] *People v. Bland, supra,* 10 Cal.4th 991, 997, citation omitted.

[43] Penal Code section 12022.5, subdivision (a) provides in pertinent part "any person who personally uses a firearm *in the commission* of a felony or attempted felony shall be punished . . . ." (Italics added.)

Similarly, Penal Code section 12022.7, subdivision (a) requires the injury occur "in the commission" of the underlying felony. This section provides in pertinent part: "Any person who personally inflicts great bodily injury on any person other than an accomplice *in the commission* of a felony or attempted felony shall be punished . . . ." (Italics added.)

[44] *People v. Alvarado* (2001) 87 Cal.App.4th 178 [104 Cal.Rptr.2d 624] (rape during the commission of a burglary upheld although rape occurred after the defendant had already taken the victim's money); *People v. Ramirez* (1995) 39 Cal.App.4th 1369 [46 Cal.Rptr.2d 530] (great bodily injury inflicted during the commission of a robbery although the defendant already had the victim's loot but had returned to the victim to the inflict the knife wounds).

the initial physical act of entry or taking. These crimes encompass the further acts of asportation, escaping with the loot, reaching a place of temporary safety and the like.[45] They are thus conceptually different from the crime at issue in this case which is complete with the conduct constituting the offense. Accordingly, we find the People's authorities unpersuasive.

Our independent research has uncovered no decision discussing the propriety of alleging or imposing either gun use or great bodily injury enhancements on this crime or any other illegal weapons possession crimes, as distinct from using these facts to impose an aggravated sentence.[46] The reason for the absence of controlling authority may be the obvious. If a defendant used a firearm, and in so doing inflicted great bodily injury, the defendant most likely was charged with and convicted of separate assault type crimes to which such enhancements properly applied—as occurred in the present case.

■ In the factual context of this case the gun use and infliction of great bodily injury were not committed *in the commission* of the static offense of carrying a concealed weapon in a vehicle. Accordingly, the jury's true findings and the gun use enhancement imposed but stayed on the concealed firearm count must be stricken.[47]

## DISPOSITION

The jury's true findings of personal use of a handgun (Pen. Code § 12022.5, subd. (a)) and infliction of great bodily injury (Pen. Code § 12022.7, subd. (a)) on Count III are stricken. The 10-year enhancement imposed and stayed for personal use of a firearm on Count III is stricken. As so modified, the judgment is affirmed.

Woods, J., and Zelon, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 17, 2004.

---

[45] See, for example, *People v. Cooper* (1991) 53 Cal.3d 1158, 1166–1167 [282 Cal.Rptr. 450, 811 P.2d 742] (in deciding the duration of a robbery the crime continues until the robber has reached a place of temporary safety).

[46] See *People v. McClindon* (1980) 114 Cal.App.3d 336, 342–343 [170 Cal.Rptr. 492] (trial court properly imposed aggravated sentence for being an ex-felon in possession of a concealable firearm because the defendant used the gun in a reckless manner and caused great bodily injury).

[47] The abstract of judgment need not be modified because it reflects an unspecified stayed term on count III and is thus accurate as it presently reads.