Filed 3/22/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B263075 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA420499) |
| v. | |
| HENRY AGUILAR, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Monica Bachner, Judge. Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

A jury found defendant and appellant Henry Aguilar guilty of aggravated kidnapping, rape in concert, oral copulation in concert, and robbery, and found firearm and kidnapping allegations true as to each count. During the trial, evidence of defendant's prior felony conviction for carrying a concealed firearm in a vehicle was admitted, over his objection, to impeach his credibility as a witness. Defendant's sole contention on appeal is that his prior conviction was not a crime of moral turpitude and its admission was therefore unlawful and prejudicial.

We hold that a felony conviction for carrying a concealed firearm in a vehicle in violation of Penal Code section 25400, subdivision (a)(1) (hereafter section 25400(a)(1))[1] is a crime of moral turpitude, and that defendant has not demonstrated the court erred in admitting evidence of his prior conviction as impeachment. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize only the testimony relevant to the narrow issue defendant raised in this appeal.

On July 4, 2012, Evelyn L.[2] was at home celebrating the holiday with her boyfriend and several neighbors. Their apartment was on 8th Street in Los Angeles. Sometime close to 2:00 a.m., her boyfriend left to walk to the liquor store a couple of blocks away. When he had not returned after almost an hour, Evelyn left the apartment to look for him.

---

[1] Defendant's 2004 conviction was a violation of Penal Code former section 12025, subdivision (a). Operative January 1, 2012, former section 12025, subdivision (a)(1) was recodified, without substantive change, as section 25400, subdivision (a)(1). (Cal. Law Revision Com. com., 51D Pt. 3 West's Ann. Pen. Code (2012 ed.) foll. § 25400, p. 196; see also § 16000 ["Deadly Weapons Recodification Act of 2010"]; Stats. 2010, ch. 711, § 6, and § 16015 ["If a previously existing provision is restated and continued in this part, . . . a conviction under that previously existing provision shall, unless a contrary intent appears, be treated as a prior conviction under the restatement and continuation of that provision."].) For clarity, we refer only to the current version of the statute.

[2] We refer to Evelyn only by her first name to protect her privacy.

After she had walked no more than a block, Evelyn felt someone pull on her purse which was hanging over her left shoulder.  She tried to push back, but then felt a gun being pressed up against her right ribcage.  She went "weak" with fear.  The person grabbed her from behind and dragged her into the back of a van.  The back seat had been removed and she was thrown on the floor.  In addition to the driver, and the man who had pulled her inside, there was a third man in the van, sitting in the back.  She tried to fight, but the two men in the back punched her.  They drove a short distance and stopped.  Evelyn was pushed out of the van and into an alley.  The van had been parked at the entrance of the alley, blocking the view from the street.

The man with the gun told Evelyn to turn around.  When she protested, he hit her in the head with the gun.  He then pushed her down completely "on all fours" and pulled down her pants.  He penetrated her vaginally.  She screamed and tried to fight, but someone kicked her in the side.  The man with the gun told the second man to put his penis in her mouth and he did so.  Evelyn was not certain what the driver was doing.  She was violated both vaginally and anally more than once, causing her to defecate.  Evelyn quit fighting because she did not want to be shot.  The three men then abruptly left together.

Evelyn pulled up her pants and ran out onto 8th Street.  She ran down the middle of the street toward a patrol car she could see parked near the on-ramp to the freeway.

It was around 3:30 a.m., when Officer Fabio Ibarra, of the California Highway Patrol, saw a woman running in his direction and shouting "hysterically."  He was outside of his patrol car conducting a traffic stop near 8th Street and Garland and she ran up to him, asking for help.  She told him she had been raped by two Hispanic men.  Officer Ibarra called the Los Angeles Police Department (LAPD) to send a unit and also called for an ambulance.

Evelyn was taken to the hospital and examined by a nurse.  She told the nurse she had gone out to look for her boyfriend and was attacked on the sidewalk, pulled into a car, and raped.  She said the assailants had punched her and held a gun to her head.  She was "crying, but cooperative."  Evelyn had visible bruising to her legs, elbows and

3

abdomen, as well as a black eye, bruising and swelling about her face. Various portions of her body, including her face, hands, and genital area, were swabbed to collect samples for DNA testing.

LAPD Officer Alfredo Morales responded to the hospital and interviewed Evelyn. She was crying, had visible injuries to her face, and appeared dirty, like she had been "rolled around" on the ground. Officer Morales collected the evidence samples from the nurse.

Evelyn gave Officer Morales a physical description of her three attackers, including the one with the gun, whom she later identified as defendant. She described the nature of the assault and that it had taken place in an alley not far from her home. There had been a red couch in the alley. From the way Evelyn described the scene of her assault, Officer Morales believed he knew what alley she was talking about because of his familiarity with the area. Officer Morales gave Evelyn a ride home, and they were able to locate the crime scene on the way there. Officer Morales saw the red couch Evelyn had mentioned, as well as one of her earrings lying on the ground, and feces consistent with her description of the incident.

Detective Edna Lopez was assigned to investigate the incident. Evelyn related the nature of the incident and also told her that her purse was taken, which contained her new cell phone, keys and various personal items. Evelyn gave Detective Lopez the number and authorization to obtain records related to the use of her phone. The records showed that in the days after the incident, there were calls and texts made to and from her stolen phone to defendant's then-girlfriend, Crystal Navarette.

Defendant was charged by information with kidnapping (Pen. Code, § 209, subd. (b)(1); count 1), forcible rape in concert (§ 264.1, subd. (a); count 2), oral copulation in concert (§ 288a, subd. (d)(1); count 3), sodomy in concert (§ 286, subd. (d)(1); count 4), and second degree robbery (§ 211; count 5). It was also alleged as to each count that defendant was armed with a firearm (semi-automatic weapon) within the meaning of section 12022, subdivision (a)(1), and as to counts 2 through 5 that defendant kidnapped the victim in the commission of the offenses (§§ 207, 209, 209.5).

4

The jury trial proceeded in July 2014. Evelyn, Officer Ibarra, Officer Morales, Detective Lopez and the emergency room nurse testified to the above facts. The results of the DNA testing were presented to the jury. Defendant's DNA was found in the swabs taken from Evelyn's left jaw, the inside of her mouth, and both of her hands. Evelyn's boyfriend was excluded as a contributor from all of the samples.

During a conference outside the presence of the jury, the court discussed with counsel the prosecution's request to use as impeachment defendant's 2004 felony conviction for carrying a concealed firearm in a vehicle. The prosecution argued it was appropriate impeachment because it reflected a readiness to do evil. The defense argued it was not a crime of moral turpitude, the prior conviction was remote in time having occurred when defendant was only 21 years old, defendant had not suffered any other convictions since that time, and the admission would be unduly prejudicial because it was too similar to the charged incident which included the firearm allegations. The court granted the prosecution's request to use the prior conviction as impeachment. The court reasoned that concealment of a firearm in a vehicle was a crime of moral turpitude, defendant's conviction was not too remote, and the charged incident involved far more serious facts, so there was little likelihood of undue prejudice by admitting evidence of the prior conviction.

Defendant testified in his own defense. He said that on July 4, 2012, he celebrated the holiday at a park with his family. They returned to his mother's home on South Union Avenue around 9:30 p.m. At the time, he was living with his mother. Shortly thereafter, defendant went out by himself "barhopping." He walked to a local bar because he does not drive or own a car. Around midnight, while standing outside a bar smoking a cigarette, he ran into Evelyn. He did not know her, but she seemed upset and he asked if she was alright. Evelyn said she had a fight with her boyfriend and asked if he would buy her a drink. He said yes and they went inside and had a drink together.

Evelyn then told defendant she was not feeling well and he offered to call her a taxi. She said they could just walk home and he agreed to walk with her. During the walk, Evelyn asked defendant if he had any money and if he was interested in her

5

"services." Defendant said he realized then she was a prostitute and told her yes, but they could not go into his mother's apartment because his mother would not approve. Defendant said she seemed agitated by that, but they went into a parking lot near his mother's apartment instead. He said they engaged in consensual acts only, with Evelyn performing oral sex on him. He denied any other sexual acts, explaining that he was unable to maintain an erection because he was too drunk. Defendant denied raping or forcing Evelyn to do anything and denied there was any van, weapon, or anyone else involved. Defendant admitted that in 2004 he suffered a felony conviction for carrying a concealed firearm in a car.

On cross-examination, defendant conceded he and Evelyn may have attempted vaginal intercourse as well but were not able to do so because of his inability to maintain an erection. He said he left Evelyn around 1:00 or 1:30 a.m. and went home to his mother's apartment and fell asleep. When he woke up the next morning he realized he had Evelyn's cell phone. He said she had been carrying the phone in her cleavage and it kept falling out as they tried to have sex, and at some point he believed he picked it up and put it in his pocket and forgot to give it back to her. Defendant said he did not try to return the phone to her because he had given her money for oral sex, which had not been satisfactory, so he decided to just keep the phone. Defendant initially denied making the texts documented in the records pertaining to Evelyn's phone even though the texts were exchanged with his then-girlfriend, Ms. Navarette. Defendant eventually admitted he was using the stolen phone and sent a couple of the texts.

Defendant's pretrial recorded interview with the investigating detectives was played for the jury. In the interview, defendant repeatedly denied any knowledge of any incident on the Fourth of July in 2012. He said he had been at the park with his kids and Ms. Navarette to watch fireworks. He denied being anywhere near 8th Street and Valencia, or with other males in a van. After he put his kids to bed that night, he hung out with his girlfriend and did not go out again for the rest of the evening. Defendant admitted he had had sex with a lot of women, but he denied raping anyone.

Later in the interview, defendant said he recalled going to some bars one night in July 2012, but it was definitely not the Fourth of July. He had drinks and danced with a forty-something Hispanic woman who bartended at the club. After having a few drinks, they walked back towards his mother's apartment, but did not go inside. They fooled around in a parking lot instead. The woman performed oral sex on him and he ejaculated. They also may have done it "doggie style." It was consensual and there were no other people involved. Defendant never referred to the woman as a prostitute.

When asked about the inconsistencies between his interview and his trial testimony, defendant said he just did not remember clearly everything that happened.

Defendant was also asked on cross-examination about a recorded phone call he made from jail to his mother. In the call, defendant's mother said that she recalled he had been out in the street with his friends lighting fireworks on July 4, 2012. Defendant responded by saying "[L]isten. We are going to say that we went to the – went to the park, okay? That's better. Look, listen, tell that to Crystal, quote, we went to Elysian park, end quote. Okay." Defendant denied he was trying to correct his mother or tell her how to testify, only that he was trying to get her to remember what they had actually done.

The jury found defendant guilty as charged, except for count 4 (sodomy in concert) on which they acquitted. Defendant was sentenced to state prison as follows: a term of 25 years to life on count 2, plus one year for the firearm allegation; a consecutive term of 25 years to life on count 3, plus one year for the firearm allegation, and a consecutive midterm of 3 years on count 5, plus one year for the firearm allegation. The court imposed and stayed a life term plus one year on count 1.

This appeal followed.

## DISCUSSION

In *People v. Castro* (1985) 38 Cal.3d 301, 317 (*Castro*), the Supreme Court held that "a witness' prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." Defendant contends the court prejudicially erred by admitting, as impeachment, his 2004 conviction

7

for carrying a concealed weapon in a vehicle because the offense is not one of moral turpitude. Respondent argues the Supreme Court concluded in *People v. Robinson* (2005) 37 Cal.4th 592 (*Robinson*) that a misdemeanor conviction for carrying a concealed weapon on one's person is a crime of moral turpitude. Therefore, respondent contends the trial court correctly found that carrying a concealed firearm in a vehicle is also such a crime. Neither party has cited a case holding that a violation of section 25400(a)(1) for carrying a concealed weapon in a vehicle is a crime of moral turpitude.

Whether a particular conviction involves moral turpitude is a question of law for the court to resolve. (*People v. Collins* (1986) 42 Cal.3d 378, 390.) In making that determination, courts follow the " 'least adjudicated elements' test" set forth in *Castro*. "The 'least adjudicated elements' test means that 'from the elements of the offense alone--without regard to the facts of the particular violation--one can reasonably infer the presence of moral turpitude.' [Citations.]" (*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091 (*Feaster*).) "Crimes involve moral turpitude when they reveal dishonesty, a ' "general readiness to do evil," ' " (*People v. Gabriel* (2012) 206 Cal.App.4th 450, 456), or "moral laxity of some kind." (*People v. Garrett* (1987) 195 Cal.App.3d 795, 798 (*Garrett*).)

Section 25400(a)(1) makes it a crime for one to carry "concealed within any vehicle that is under the person's control or direction any pistol, revolver, or other firearm capable of being concealed upon the person." Conviction under the statute requires proof that the "defendant carried within a vehicle a firearm capable of being concealed on the person," the "defendant knew the firearm was in the vehicle," the "firearm was substantially concealed," and the "vehicle was under the defendant's control or direction." (See CALCRIM No. 2521.)

Defendant maintains that a violation of the statute is a passive crime and that moral turpitude cannot necessarily be inferred from the "least adjudicated elements" because there is no affirmative act required which evinces a readiness to do evil. We disagree with defendant's characterization of the offense. Section 25400(a)(1) is part of The Dangerous Weapons Control Law. (See generally Pen. Code, § 23500 et seq.) It is

well established that crimes involving firearms pose a recognized risk of violence. (See, e.g., *People v. Nelums* (1982) 31 Cal.3d 355, 359-360 [even "passive display" of an inoperable firearm may "stimulate resistance" and carries increased risks of harm thus justifying enhanced punishment].) Because of the risk of violence inherent with the possession and use of firearms, statutes imposing prohibitions on firearms have long been upheld as a legitimate exercise of the state's regulatory authority. (See, e.g., *District of Columbia v. Heller* (2008) 554 U.S. 570, 626-628, 636 (*Heller*) [acknowledging constitutional validity of prohibitions on firearms including the carrying of concealed weapons, and distinguishing such uses from the traditionally lawful purpose of "self-defense within the home"]; *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 313-314 (*Yarbrough*) [rejecting constitutional challenge to former Pen. Code, § 12025, subd. (a)]; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1346-1347 [same].)

Numerous crimes involving firearms have been held to involve moral turpitude. (See, e.g., *Garrett*, *supra*, 195 Cal.App.3d at pp. 799-800 [conspiracy to possess unregistered firearms in violation of federal statute]; *Feaster*, *supra*, 102 Cal.App.4th at pp. 1092-1093 [negligent discharge of firearm under Pen. Code, § 246.3, which could result in injury or death]; *People v. Rivera* (2003) 107 Cal.App.4th 1374, 1378-1382 [misdemeanor possession of deadly weapon with intent to assault].)

We are not persuaded by defendant's argument that the act of intentionally carrying a concealed firearm in a vehicle, hidden from the view of others, but capable of ready use, fails to connote moral turpitude. "[C]arrying a firearm concealed on the person or in a vehicle . . . is not in the nature of a common use of a gun for lawful purposes which the court declared to be protected by the Second Amendment in *Heller*. [Citation.] Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized 'threat to public order,' and is ' "prohibited as a means of preventing physical harm to persons other than the offender." [Citation.]' [Citation.]" (*Yarbrough*, *supra*, 169 Cal.App.4th at pp. 313-314.) "[A] person who carries a concealed firearm in a vehicle, in an unlocked case which permits him immediate access to the firearm but impedes others from detecting its presence, poses an

'imminent threat to public safety . . . .' [Citation.]" (*People v. Hodges* (1999) 70 Cal.App.4th 1348, 1357.)[3]

Simply because a violation of section 25400(a)(1) does not require either an intent to injure, or the brandishing or discharging of the weapon, does not mean the crime fails to connote moral turpitude. Indeed, several courts have concluded that the possession of a firearm may evince moral turpitude. In *Robinson*, *supra*, 37 Cal.4th 592, the Supreme Court addressed the defense contention that the trial court had wrongly excluded prior misdemeanor convictions for carrying a concealed handgun on one's person as against two prosecution witnesses. The Supreme Court affirmed the trial court's exercise of discretion to exclude the prior convictions on the grounds the probative value was outweighed by prejudice, but in so concluding, the court expressed its agreement that "the misdemeanor convictions suffered by [the two witnesses] reflected a crime of moral turpitude." (*Id.* at p. 626; see also *People v. Robinson* (2011) 199 Cal.App.4th 707, 714-715 [possession of firearm by felon]; *People v. Littrel* (1986) 185 Cal.App.3d 699, 702-703 [same]; *People v. Gabriel*, *supra*, 206 Cal.App.4th at pp. 456-458 [possession of assault weapon].)

Defendant argues the crime of carrying a concealed firearm on one's person is qualitatively different because it presupposes intentionally arming oneself, an act which evinces a readiness to do evil. Defendant contends that, in contrast, a violation of section 25400(a)(1) does not require proof that the defendant was the one who concealed the firearm in the vehicle, or any other affirmative act. This argument fails because a violation of section 25400(a)(1) requires proof that the defendant *knowingly and intentionally* carried a firearm concealed in a vehicle under his control. (*People v. Jurado* (1972) 25 Cal.App.3d 1027, 1030 ["under the various statutes making criminal the possession of a weapon, knowledge of the presence and character of the object is an

---

[3]    The statutory scheme enumerates various exemptions for the lawful transport of a firearm in a vehicle, including, for example, within a locked container (Pen. Code, § 25610), to and from a licensed target range (§ 25540), or by a licensed hunter or fisherman while engaged in hunting or fishing (§ 25640).

element of the offense"].) A defendant who intentionally carries a concealed firearm in a vehicle "which permits him immediate access to the firearm but impedes others from detecting its presence, poses an 'imminent threat to public safety.' [Citation.]" (*People v. Hodges*, *supra*, 70 Cal.App.4th at p. 1357.) In our view, such conduct evinces moral turpitude in the same way as personally arming oneself.

Defendant's reliance on *People v. Arzate* (2003) 114 Cal.App.4th 390 is also unavailing. The court in *Arzate* was not asked to consider whether a violation of section 25400(a)(1) was a crime of moral turpitude. Rather, the court was asked to decide whether a conviction for carrying a concealed firearm in a vehicle supported a firearm *use* enhancement pursuant to Penal Code section 12022.5. *Arzate* rejected the defendant's argument that the "act of concealing a handgun is synonymous with its use." (*Arzate*, at p. 399.) Given the separate context of *Arzate*, we do not find it instructive on the issue presented here.

In sum, we hold that the crime of carrying a concealed firearm in a vehicle in violation of section 25400(a)(1) is a crime of moral turpitude which may be used as impeachment.

The admission of the prior conviction nonetheless remained subject to the trial court's broad discretion "under [Evidence Code] section 352." (*Castro*, *supra*, 38 Cal.3d at p. 317.) "A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.) We find no such abuse.

The court balanced relevant factors in assessing the admissibility of the prior conviction. The court found that the prior conviction which occurred just eight years before the charged offenses was not too remote. The court also found that prejudice did not outweigh the probative value because the charged offenses were much more serious and not substantially similar, such that the jury was not likely to be unfairly influenced by the prior conviction. Defendant argues the admission caused significant prejudice

11

because the case was essentially a "he said-she said" credibility contest. It is precisely for that reason that the court correctly found that defendant's prior conviction of a crime of moral turpitude was highly relevant. The court instructed the jury with CALCRIM No. 316 which provides, in relevant part, that "[i]f you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you do decide the weight of that fact and whether that fact makes the witness less believable." Defendant has not demonstrated that the admission of his prior conviction resulted in a "miscarriage of justice." (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 705.)

## DISPOSITION

The judgment of conviction is affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.

12