[No. B225763. Second Dist., Div. Five. Oct. 5, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
BRYAN CALLES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Discussion, parts A., B., and C.

**1204**

**COUNSEL**

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle, Steven D. Matthews, Robert David Breton and Linda C. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.—**

### INTRODUCTION

Defendant and appellant Bryan Calles (defendant) was convicted of two counts of gross vehicular manslaughter (Pen. Code, § 192, subd. (c)(1)),[1] three counts of leaving the scene of an accident (Veh. Code, § 20001, subd. (a)), and one count of second degree murder (§ 187, subd. (a)). On appeal, defendant claims that certain errors occurred at trial. In the published portion of this opinion, we hold that the jury did not commit misconduct by using a watch to time a period in question in order to consider the events that could have taken place in that period. We also hold that the trial court erred in failing to dismiss certain counts and by staying or failing to stay execution on defendant's sentence with respect to certain counts and enhancements. The trial court also erred in awarding defendant presentence custody credits and failing to impose a criminal conviction assessment. We

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

reverse and remand the matter for sentencing consistent with this opinion, and otherwise affirm the judgment.

## BACKGROUND

A. *Factual Background*

1. *Prosecution Evidence*

Juan Rodriguez worked with defendant at the Bullet Freight Company. On May 16, 2008, they were scheduled to work at 7:00 p.m. At approximately 5:00 or 6:00 p.m. that day, Rodriguez dropped off defendant at his car after they had intentionally inhaled nitrous oxide for about three to four hours.

Gustavo Lezama also worked with defendant at Bullet Freight Company and also was scheduled to begin work at 7:00 p.m. on May 16, 2008. On that day, Lezama was driving east on East Washington Boulevard on his way to work. When stopped at a red traffic light, Lezama heard defendant shout Lezama's name, and Lezama saw defendant perspiring and waiving at him from his Honda Civic in the left adjacent lane. When the traffic light turned green, Lezama drove forward through the intersection, but defendant remained at the intersection for three or four seconds and continued waving while still looking in the direction of where Lezama's vehicle had been when he had been stopped at the traffic light.

Lezama then saw defendant's vehicle leave the intersection and follow about three to four car lengths behind Lezama's vehicle. When defendant had traveled approximately one-quarter mile, Lezama saw defendant drive into the middle divider lane as if to make a U-turn, and he heard the engine of defendant's vehicle "roar." Lezama, looking over his shoulder, saw defendant's vehicle accelerate, swerve across oncoming traffic, and turn toward the sidewalk striking four pedestrians. Lezama saw two of the pedestrians "fly up really high." One pedestrian landed on the top of a fence and the other slammed into a wall. Lezama also saw that a woman was under defendant's vehicle. Lezama did not hear any sound, such as a "screeching sound," that would have indicated that defendant pressed hard on the brakes before the impact. Lezama pulled over to the side of the road, approximately 15 feet from the accident and exited his vehicle to attend to the accident victims.

On May 16, 2008, Michelle Pineda was walking on the sidewalk adjacent to East Washington Boulevard with her friends from work, Lisa Santee, Miguel Rocha, and Dominic Medina, when a car suddenly hit her friends. Following the impact, Rocha's body was near a pole and there was a pool of blood emanating from his head.

According to Pineda, as a result of the impact, Medina was impaled and suspended off the ground by spikes on a wrought iron fence. Lezama testified that the fence spikes entered Medina's abdomen and exited his chest. Daniel Dragotto, a Los Angeles City Fire Department paramedic, and others cut Medina down from the fence. Medina was alive and transported to the hospital with parts of the spikes still in his chest.

Lezama testified that following the impact, Santee was under the driver's side of defendant's vehicle "screaming for help loudly." Pineda observed that Santee's arms were unnaturally bent, as if they were broken.

According to Lezama and Pineda, Pineda continuously screamed "Oh God." Pineda noticed defendant stare at her. Defendant had both eyes open, and he appeared to be in a state of shock.

Faye Shen, the owner of a nearby business, saw the accident scene shortly after defendant's vehicle struck the pedestrians. Shen noticed that defendant's eyes were open and that defendant stared straight ahead for a "couple of minutes" without any reaction.

Neither Pineda nor Shen saw defendant get out of his car. Pineda testified that defendant never checked on the welfare of anyone who was in that area.

Just after Pineda started to walk to her nearby office to get help, defendant started his vehicle. She heard defendant's vehicle "rev[] up," the tires "screech," and Santee scream. Lezama saw defendant reverse his vehicle, which was on the sidewalk, over Santee; the tire rim exposed by a blown out tire on defendant's vehicle "grinded her." Pineda saw Santee "bouncing" from the sidewalk to the gutter.

Shen was about two feet from defendant when he started to back up, and she yelled at him, "Oh my God, please stop. Stop." Defendant, whose driver's side window was rolled down, ignored Shen's pleas and, without looking back to see if any cars were coming, continued to back up into the street, dragging Santee's body across the sidewalk and rolling over her body as it fell into the gutter. After defendant backed into the street, Lezama saw him drive away from the scene westbound on East Washington Boulevard.

Defendant's coworker, Rodriquez, explained that as he was driving to work at Bullet Freight Company with two friends, he saw defendant driving in the opposite direction. Defendant's face was bloody, and his vehicle was "totaled" and driving "on its rims." Rodriguez executed a U-turn, caught up to defendant, and gestured for defendant to meet them at a nearby McDonald's. Defendant and Rodriguez made a series of turns and entered the McDonald's parking lot.

According to Rodriguez, the driver's door of defendant's vehicle was damaged, its window was shattered, and the roof and front fender were smashed. When Rodriguez and his friends asked defendant what had happened, defendant, who had blood "running from his forehead all the way to his cheeks," said nothing and was mumbling to himself. Defendant appeared to be in a state of shock. Rodriguez and his friends took items from defendant's vehicle and placed them in Rodriguez's vehicle, including a tank of nitrous oxide, papers, and clothing. Defendant entered Rodriquez's vehicle with Rodriquez and his friends, and they drove to the Bullet Freight Company so defendant and Rodriguez could commence work.

After defendant started his work shift, Alex Prosak, the assistant manager at Bullet Freight Company, asked defendant if he had been involved in an incident. Defendant responded that he was involved in a "hit-and-run accident" approximately six miles away near the 710 and 105 freeways. The intersection of the 710 and 105 freeways was not near the accident involving the pedestrians on East Washington Boulevard. Defendant responded to all of Prosak's questions, but his "mind seemed to be wandering."

Los Angeles Police Department Officer Jorge Gonzalez testified that he went to a McDonald's parking lot where he saw defendant's vehicle. Defendant's vehicle had two flat tires, the windshield and roof were caved in, the front bumper was almost completely detached, and the left portion of the one of the bumpers was missing. There was blood on the undercarriage, roof, seat, gear shift, and what was left of the windshield. The Los Angeles Police Department impounded defendant's vehicle and placed an agency hold on it.

Officer Gonzalez arrested defendant in the early morning of May 17, 2008. Defendant had a laceration on his forehead and complained of pain in his face and shoulder. Defendant received medical treatment at the county jail.

Los Angeles Police Department Collision Investigator Danny Balmaceda did not perform any mechanical analysis of defendant's vehicle, but he saw the vehicle and went inside it. He did not notice "anything odd" about the position of the steering wheel.

As a result of the accident, Medina's right lung was pierced, both of his legs and left forearm were broken, and his mouth was lacerated. Medina was hospitalized for about two months, undergoing surgery and followup care, and was still receiving physical therapy at the time of trial.

When Christopher Hare, a City of Los Angeles Fire Department Captain, arrived at the scene of the accident, Rocha was dead. Los Angeles County Coroner's Office Medical Examiner Kevin Young opined that Rocha died

from the severe and multiple injuries he had sustained. Rocha had sustained massive skull and facial fractures which partially severed his brain stem. In addition, Rocha's pelvis, right femur, left tibia, and half of his ribs were fractured, and his lungs, spleen, and liver had been perforated.

When Benjamin Arnold, a paramedic for the City of Los Angeles Fire Department, arrived at the scene of the accident, Santee was still alive. He and other paramedics initiated life support procedures, but Santee "lost her pulse" and died while being transported to the hospital. Jeffrey Gutstadt, a deputy medical examiner who performed Santee's autopsy, testified that Santee sustained numerous injuries, including to her internal organs, and fractures to her collarbone, sternum, and all of her ribs. Gutstadt could not determine with "medical certainty" whether the initial impact with defendant's vehicle or the subsequent "rolling over action" when defendant's vehicle backed over Santee was the actual cause of her death.

### 2. Defense Evidence

Dr. Paul Herrmann, defendant's forensic expert, could not determine whether Santee's death was caused by her initial impact with defendant's vehicle or by the injuries she suffered when defendant backed over her. All of Santee's injuries occurred when she was still alive. Dr. Herrmann could not determine the exact order of her injuries because they were "so numerous and . . . similar."

Dale Stephens, defendant's accident reconstruction expert, opined that defendant's vehicle was traveling at approximately 40 miles per hour upon impact with the pedestrians. After the incident, defendant's vehicle was originally impounded by the police and then towed to a storage facility where the police placed an agency hold on it. It was released from impound three months after the accident.

### B. Procedural Background

The Los Angeles County District Attorney filed a fourth amended information charging defendant with the gross vehicular manslaughter of Rocha and Santee in violation of section 192, subdivision (c)(1) (counts 1 and 2); leaving the scene of an accident, in violation of Vehicle Code section 20001, subdivision (a) (counts 3, 7, and 8); and the second degree murder of Santee in violation of section 187, subdivision (a) (count 9). The district attorney alleged as to counts 1 and 2 that defendant fled the scene of a crime in violation of Vehicle Code section 20001, subdivision (c), and as to all counts that defendant inflicted great bodily injury in violation of Penal Code section

12022.7, subdivision (a). Defendant filed *Trombetta/Youngblood*[2] motions concerning the destruction of evidence, which the trial court denied.

Following trial, the jury found defendant guilty on all counts, and found the special allegations true. On count 1, the jury convicted defendant of the gross vehicular manslaughter of Rocha (§ 192, subd. (c)(1)), found that great bodily injury was inflicted on both Santee and Medina (§ 12022.7, subd. (a)), and found that defendant fled the scene of the crime (Veh. Code, § 20001, subd. (c)).[3] On count 2, the jury convicted defendant of the gross vehicular manslaughter of Santee (§ 192, subd. (c)(1)), found that great bodily injury was inflicted on both Rocha and Medina (§ 12022.7, subd. (a)), and found that defendant fled the scene of the crime (Veh. Code, § 20001, subd. (c)). On counts 3, 7, and 8, defendant was convicted of leaving the scene of an accident. (Veh. Code, § 20001, subd. (a).) Each leaving the scene of an accident count named a different victim upon whom great bodily injury was inflicted: Medina in count 3, Santee in count 7, and Rocha in count 8. On count 9, the jury convicted defendant of the second degree murder of Santee (§ 187, subd. (a)) and found great bodily injury was inflicted on both Rocha and Medina (§ 12022.7, subd. (a)). The trial court denied defendant's motion for new trial or modification of the verdict made, in part, on the ground of juror misconduct. The trial court stayed execution of sentence on all counts except count 9. On count 9, the trial court sentenced defendant to state prison for a term of 23 years to life, consisting of a term of 15 years to life; 5 years based on a purported allegation of fleeing the scene of a crime in violation of Vehicle Code section 20001, subdivision (c);[4] and 3 years based on the allegation of inflicting great bodily injury in violation of Penal Code section 12022.7, subdivision (a).[5]

The trial court ordered defendant to pay a $7,500 victim compensation and government claims board fee, a $3,659.72 restitution fee to Santee (presumably, to her successors), a $200 restitution fee, a $200 parole revocation restitution fine, a $30 court security fee for each count, and orally imposed a $30 criminal conviction assessment as to each count for which defendant was

---

[2] The motions were made pursuant to *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528]; *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333].

[3] Vehicle Code section 20001, subdivision (c) provides that a defendant's sentence shall be enhanced if he flees the scene of a "crime" after committing a violation of, inter alia, section 192. Subdivision (a) provides that a driver involved in an accident resulting in injury to a person shall stop the vehicle at the scene of the "accident."

[4] As discussed *post*, defendant was not charged in count 9 with an enhancement allegation of fleeing the scene of a crime in violation of Vehicle Code section 20001, subdivision (c).

[5] The trial court stated that two great bodily injury enhancements concerning count 9—one as to Rocha and one as to Medina—were to run concurrently with each other.

convicted. The trial court awarded defendant 855 days of custody credit consisting of 744 days of actual custody credit and 111 days of conduct credit.

## DISCUSSION

A.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

D. *Motion for New Trial Based on Juror Misconduct*

Defendant contends that the trial court erred in denying his motion for a new trial based, in part, on juror misconduct. We disagree.

### 1. *Standard of Review*

"We review independently the trial court's denial of a new trial motion based on alleged juror misconduct. (*People v. Ault* (2004) 33 Cal.4th 1250, 1261–1262 [17 Cal.Rptr.3d 302, 95 P.3d 523].) However, we will ' "accept· the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' (*Id.* at p. 1263.)" (*People v. Gamache* (2010) 48 Cal.4th 347, 396 [106 Cal.Rptr.3d 771, 227 P.3d 342].)

### 2. *Background*

During closing argument, defendant's counsel asserted that witnesses gave different time periods when estimating the time that elapsed between the initial impact with the pedestrians and the moment defendant started to back up his vehicle. Defendant's counsel argued that Pineda provided various time estimates during her testimony, the total of which was "upwards of 30-plus seconds" from the initial impact to defendant's act of reversing his vehicle and running over Santee. The timing was relevant to what occurred and to defendant's state of mind. Following trial, defendant filed a motion for new trial based, in part, on alleged juror misconduct for conducting a timing "experiment" during deliberations.

Defendant's counsel declared in support of the motion that the jury foreperson told him, and was willing to tell the trial court, that "[d]uring the deliberations in the jury room in the presence of all the jurors a timing demonstration was conducted. [¶] This demonstration consisted of one jury

---

*See footnote, *ante*, page 1200.

person looking at their analog watch, and timing out 30 seconds according to the second hand on the watch. [¶] While the one jury person was keeping track of time, the other jury members were silent in an attempt to simulate the passing of 30 seconds of time. [¶] During our deliberations, various jurors also participated in verbally constructing what happened during the time between the initial impact and when the defendant backed up. This scenario included a discussion as to the time it takes to shift gears while driving on the rims of the car and the time needed to get the car off of the fence. [¶] About 75% of our deliberations focused on the implied malice aspect of the case and more specifically what he knew at the time of the impact and what he knew immediately after when he backed up. [¶] The timing of the events between the initial impact and the defendant driving away from the scene played into deciding how much he knew and his state of mind. [¶] During deliberations I was aware of the various time increments that were testified to during the trial by different witnesses. There were three different witnesses who testified to three different time periods during the course of the trial. [¶] These time periods were the amount of time the various witnesses believed passed from the point of impact to when [defendant] started to reverse his car. [¶] The time periods discussed were: 2 to 3 seconds; 30 seconds and 2 to 3 minutes. [¶] However, . . . the timing demonstration was only conducted for the 30 second time period. [¶] This 30 second time demonstration did play a part in [the] deliberative process." The trial court denied the motion, stating that the jury's use of a watch did not rise to the level of juror misconduct warranting a new trial.

### 3. *Applicable Law*

Section 1181, subdivision 3, provides that the trial court may grant a new trial when " 'the jury has . . .' 'been guilty of any misconduct by which a fair and due consideration of the case has been prevented' . . . . [¶] We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the misconduct was prejudicial." (*People v. Collins* (2010) 49 Cal.4th 175, 242 [110 Cal.Rptr.3d 384, 232 P.3d 32], citation omitted.)

Juror misconduct raises a presumption of prejudice. (*People v. Page* (2008) 44 Cal.4th 1, 59 [79 Cal.Rptr.3d 4, 186 P.3d 395].) Unless the presumption is rebutted by the prosecution, a new trial should be granted. (*Ibid.*) As one court has noted, "[t]his does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside." (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507 [90 Cal.Rptr.2d 502]; see *Bandana Trading Co., Inc. v. Quality Infusion Care, Inc.* (2008) 164 Cal.App.4th 1440, 1445 [80 Cal.Rptr.3d 495].)

■ The court in *People v. Collins, supra,* 49 Cal.4th 175 observed that "[t]his court established the framework for analysis of a jury misconduct claim based on experimentation nearly a century ago in *Higgins v. L. A. Gas & Electric Co.* (1911) 159 Cal. 651 [115 P. 313]. Justice Hinshaw explained: 'It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of exhibits by the jury. They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain.' " (*People v. Collins, supra,* 49 Cal.4th at p. 243, italics omitted.)

### 4. *Analysis*

Defendant contends the timing "experiment" was an attempt by the jurors to simulate the events on the evening of the accident, including "the various things [defendant] would have to do to back away from the scene [but the jurors] could not replicate the evidence presented [to the jury] because the jury did not use [defendant's vehicle]." In support of his contention, defendant cites *Bell v. State of California* (1998) 63 Cal.App.4th 919 [74 Cal.Rptr.2d 541]. In that case, the court held that it was juror misconduct when, during deliberations, one of the jurors advised the others that she and a third party had tried to replicate the manner in which the plaintiff claimed he was held by police. Quoting the trial court, the court stated, " 'The incident the juror was attempting to replicate is not subject to experimentation because of the inability to accurately duplicate critical factors such as the size, strength and height of the individuals, the amount of force involved, and the specific or unusual physical characteristic of each individual involved.' " (*Id.* at p. 932.)

Defendant also relies upon *People v. Castro* (1986) 184 Cal.App.3d 849 [229 Cal.Rptr. 280]. In that case, the evidence showed that a correctional officer, standing 50 to 100 yards away, used binoculars to identify the defendant as a participant in an arson. During deliberations, a juror went home and used binoculars in an attempt to determine what the officer could have seen and reported his findings to the other jurors. (*Id.* at p. 852.) The court reversed the trial court's denial of the defendant's motion for new trial, stating, "there is no showing . . . that [the juror's] binoculars were 'similar' to the binoculars used by [the correctional officer] . . . or that the light

conditions and distances used at the time of [the juror's] personal experiment were similar to the conditions at the time [the correctional officer] identified [the defendant]." (*Id.* at p. 854.) The court concluded that the juror's experiment "enabled [him] to receive evidence outside the presence and knowledge of [the defendant] going to the crucial element in the . . . case, the identity of the [defendant]." (*Ibid.*)

Both cases upon which defendant relies are inapposite because unlike in those cases, the jurors in this case were not trying to replicate physically the events or recreate events by use of items outside of the evidence. The jurors were merely using a watch and discussing the evidence presented to them. Generally, jurors cannot discuss a disputed incident emulating the precise conditions that existed at the actual incident itself. In this case, the jurors could not in their oral discussions have recreated the scene of the accident in all of its aspects.

■ During closing argument, defense counsel argued that the witnesses testified to different time periods between the initial impact with the pedestrians and defendant's act of backing his vehicle over Santee. According to defense counsel, there was insufficient time for defendant to act in conscious disregard for human life. Defendant's trial counsel, in essence, invited the jury to examine the various time estimates provided by the different witnesses. Accordingly, the jury merely reviewed the testimony about what occurred at the accident scene while checking it against the reported time lapse of 30 seconds. The 30-second time period was evidence introduced at trial and argued by defendant's counsel. By comparing the passage of 30 seconds on a watch with the evidence of the events, the jury applied a natural phenomenon—the passage of time. (See *People v. Vigil* (2011) 191 Cal.App.4th 1474, 1485 [120 Cal.Rptr.3d 643] [no misconduct "where the jurors employed their own reasoning skills in a demonstrative manner or performed tests in the jury room that were confined to the evidence admitted at trial"].)

Defendant also relies on *Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724 [286 Cal.Rptr. 435] (*Smoketree*), but that case is also inapplicable to the facts of this case. In *Smoketree*, a condominium association sued the complex's developers for damages arising from faulty concrete and grading work in the complex, and the developers cross-complained against various subcontractors. (*Id.* at pp. 1730–1731.) Evidence was presented during trial that certain concrete slabs were improperly constructed. (*Id.* at p. 1731.) During deliberations, a juror created a model of forms used to create concrete slabs using a small box filled with "kitty litter" and some crayons she brought into the deliberation room to demonstrate how concrete was poured. (*Id.* at p. 1745.) In conducting this demonstration, the

juror told fellow jurors that she was knowledgeable about concrete construction, and explained that the defects in the concrete could have been caused by persons walking across the building pad and leaving foot impressions before the concrete was poured. (*Id.* at pp. 1745–1746 & fn. 16.)

The court in *Smoketree, supra*, 234 Cal.App.3d 1724 concluded that the demonstration constituted misconduct because it brought new evidence into the deliberations. The court said that the juror "presented a new demonstration (i.e., there was no kitty litter and crayola demonstration conducted by any of the experts in the case). . . . Further, when [the juror] conducted the demonstration, she represented she had special knowledge about concrete practices . . . . [The juror] additionally presented new evidence that inconsistencies in the sand on top of which the concrete is placed can be caused by the footprints of people walking back and forth across the building pad before the concrete is poured. [The developer] had no opportunity to challenge the accuracy of [the juror's] demonstration nor her representations of special knowledge about concrete practices." (*Id.* at p. 1749, citation & fn. omitted.)

Defendant argues that, as in *Smoketree, supra*, 234 Cal.App.3d 1724, the jurors' timing "experiment" included new elements of the incident—the calmness and quietness of the jury room and the lack of a head injury—and thereby introduced new evidence into the deliberation room. The timing "experiment," however, did not constitute the introduction of new evidence into the deliberations. The passage of time is not dependent on the conditions at the time of the accident, which could not be replicated.

■ As stated in *People v. Collins, supra*, 49 Cal.4th at page 249, "Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted."

■ Here, as stated by one juror, the jurors "verbally construct[ed] what happened." Defendant has failed to establish juror misconduct because he did not establish that the so-called timing "experiment" went beyond the admitted evidence. Moreover, what allegedly occurred was not " 'of such a character as is likely to have influenced the verdict improperly.' " (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 554 [261 Cal.Rptr. 1], superseded by statute on

other grounds as noted in *People v. Wilson* (1996) 43 Cal.App.4th 839, 852 [50 Cal.Rptr.2d 883].) The trial court did not err in denying defendant's motion for new trial.

E. *Sentencing Issues*

After the matter was fully briefed, we raised with the parties certain sentencing issues and requested them to submit letter briefs addressing them, which we reviewed. We also granted rehearing to consider points raised by respondent. We conclude that the sentencing in this case must be modified.

1. *Stay of Execution of Sentence on Substantive Crimes*

(a) *Introduction*

The jury found defendant guilty on all counts. The trial court imposed and stayed execution of sentence on all counts except count 9—second degree murder of Santee. As discussed below, the trial court should not have stayed count 1—vehicular manslaughter of Rocha—but the trial did not err in staying execution of sentence on count 2—gross vehicular manslaughter of Santee. As to counts 3, 7, and 8, the trial court should select one count on which to impose a sentence, staying execution of sentence on that count, and dismiss the other two counts.

(b) *Stay of Execution of Sentence on Count 1—The Gross Vehicular Manslaughter of Rocha*

Pursuant to section 654, subdivision (a), the trial court stayed execution of sentence on count 1, the gross vehicular manslaughter of Rocha. In doing so, the trial court erred.

■ Section 654, subdivision (a) provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (See *People v. Jones* (2012) 54 Cal.4th 350, 357 [142 Cal.Rptr.3d 561, 278 P.3d 821]; *People v. Mesa* (2012) 54 Cal.4th 191, 195 [142 Cal.Rptr.3d 2, 277 P.3d 743].) The California Supreme Court has stated, "We have long held that 'the limitations of section 654 do not apply to crimes of violence against multiple victims.' [Citation.] As we have explained: 'The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more

culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not ". . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual." [Citations.]' [Citation.]" (*People v. Oates* (2004) 32 Cal.4th 1048, 1063 [12 Cal.Rptr.3d 325, 88 P.3d 56]; see *People v. Shaw* (2004) 122 Cal.App.4th 453, 459 [18 Cal.Rptr.3d 766]; *People v. Pantoja* (2004) 122 Cal.App.4th 1, 16 [18 Cal.Rptr.3d 492].)

Gross vehicular manslaughter is a crime of violence. (*People v. McFarland* (1989) 47 Cal.3d 798, 803–804 [254 Cal.Rptr. 331, 765 P.2d 493].) The court in *People v. Thompson* (2009) 180 Cal.App.4th 974 [103 Cal.Rptr.3d 242] stated, "In *People v. McFarland* (1989) 47 Cal.3d 798 [254 Cal.Rptr. 331, 765 P.2d 493], our California Supreme Court concluded that section 654 does not prohibit separate punishment where a drunk driver kills one victim (vehicular manslaughter) and injures another (causing bodily injury while driving under the influence of alcohol (Veh. Code, § 23153, subd. (a)) because 'vehicular manslaughter with gross negligence constitutes a crime of violence against the person' and thus 'where, as here, a defendant commits vehicular manslaughter with gross negligence—an act of violence against the person—he may properly be punished for injury to a separate individual that results from the same incident.' (*People v. McFarland, supra,* at pp. 803–804, fn. omitted.)" (*People v. Thompson, supra,* 180 Cal.App.4th at p. 978.)

As a result of the impact, Rocha's body was thrown to the ground and there was a one-foot-diameter pool of blood emanating from his head. Rocha sustained massive skull and other fractures, a partially severed brain stem, and ruptured internal organs. Rocha died at the scene from the severe and multiple injuries he sustained. Accordingly, the crime against Rocha was a crime of violence—to which section 654 does not apply. The trial court erred in staying execution of sentence on count 1.

### (c) Stay of Execution of Sentence on Count 2—The Gross Vehicular Manslaughter of Santee

Pursuant to section 654, subdivision (a), the trial court stayed execution of sentence on count 2, the gross vehicular manslaughter of Santee, based on the imposition and execution of sentence on count 9, the second degree murder of Santee. Defendant may not be punished twice for causing the death of Santee. (§ 654, subd. (a).) Accordingly, the trial court did not err in staying execution of sentence on count 2.

(d) *Dismissal of Two of Counts 3, 7, or 8—Leaving the Scene of an Accident—and Stay of Execution of Sentence on Remaining Count*

■ Pursuant to section 654, subdivision (a), the trial court stayed execution of sentence on counts 3, 7, and 8 for leaving the scene of an accident (Veh. Code, § 20001, subd. (a)), each of which names a different victim upon whom great bodily injury was inflicted: Medina in count 3, Santee in count 7, and Rocha in count 8. But there can be only one conviction for leaving the scene of an accident. (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1002 [66 Cal.Rptr.3d 422].) Upon remand, the trial court is to select one leaving the scene of the accident count and, pursuant to section 1385, subdivision (a), dismiss the remaining two leaving the scene of the accident counts.

■ The execution of the sentence for the remaining count should be stayed. Often, section 654, subdivision (a) does not apply to counts for leaving the scene of an accident because it involves an act separate from a count relating to causing the accident, with a separate objective. (*People v. Butler* (1986) 184 Cal.App.3d 469, 471–474 [229 Cal.Rptr. 103]; *People v. Steinbach* (1958) 166 Cal.App.2d 307, 312–313 [333 P.2d 147]; see *People v. McGuire* (1993) 14 Cal.App.4th 687, 699 [18 Cal.Rptr.2d 12].) Here, however, the counts for leaving the scene of an accident—counts 3, 7, or 8, are not separate acts with separate objectives when compared to the leaving the scene enhancement alleged in count 1. There was only one act of leaving the scene of an accident.

Section 654, subdivision (a) provides that when an act is punishable in different ways by different provisions of law it shall be punished "under the provision that provides for the longest potential term of imprisonment." The sentence on each of counts 3, 7, and 8, for leaving the scene of an accident pursuant to Vehicle Code section 20001, subdivision (a) provides a shorter potential term of imprisonment than the sentence on the fleeing the scene of a crime enhancement imposed under Vehicle Code section 20001, subdivision (c), alleged in count 1. The longest potential term of imprisonment on each of count 3, 7, or 8, for leaving the scene of an accident pursuant to Vehicle Code section 20001, subdivision (a) is one year—that is, one-third the middle term of three years because it is a "subordinate term"—the principal term being for second degree murder. (§ 1170.1, subd. (a); Veh. Code, § 20001, subd. (b)(1) & (2).) As discussed *post*, the great bodily injury enhancement for any one of the leaving the scene of an accident counts must be stayed.[7] The longest potential term of imprisonment for the fleeing the scene of a crime enhancement pursuant to Vehicle Code section 20001, subdivision (c) alleged in count 1 is five years. (Veh. Code, § 20001,

---

[7] The great bodily injury enhancement sentence is three years. (§ 12022.7, subd. (a).)

subd. (c).) Thus, the sentence for the fleeing the scene of a crime enhancement is greater than the sentence for the leaving the scene of an accident offense. Whichever count for leaving the scene of an accident is selected by the trial court, execution of sentence on that selected count should be stayed, and the sentence on the fleeing the scene of a crime enhancement alleged in count 1 should be maintained.

### 2. Enhancements

#### (a) Introduction

The sentences in this case were subject to enhancements based on defendant fleeing the scene of the crime (Veh. Code, § 20001, subd. (c)) and on his infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)). The imposition of these enhancements raises an issue of whether execution of sentence on one or more of them should be stayed by virtue of section 654.

■ Our Supreme Court discussed the application of section 654 to enhancements in *People v. Ahmed* (2011) 53 Cal.4th 156 [133 Cal.Rptr.3d 856, 264 P.3d 822] (*Ahmed*). Prior to that case, the Supreme Court had not determined whether section 654 applied to enhancements. In *Ahmed*, the Supreme Court outlined the method for determining whether a trial court can impose and execute multiple sentence enhancements for the same offense. Under that opinion, a court should examine the specific sentencing statutes. If they provide the answer as to whether the trial court may impose and execute multiple sentence enhancements, the court need not consider the more general provisions of section 654, because a specific statute prevails over a more general one. (53 Cal.4th at pp. 160–161, 162, 164.)

If the specific sentencing statutes do not resolve the issue, section 654 applies to enhancements (*Ahmed, supra*, 53 Cal.4th at pp. 161, 164), although it applies differently to enhancements than to substantive crimes (*id.* at pp. 161, 164–165). Provisions defining substantive crimes generally define criminal acts; enhancement provisions increase the punishment for those acts by "focus[ing] on *aspects* of the criminal act that are not always present and that warrant additional punishment." (*Id.* at p. 163.) "[W]hen applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act." (*Id.* at p. 164.)

In *Ahmed, supra*, 53 Cal.4th at pages 164 to 168, the Supreme Court concluded that a specific sentencing statute, section 1170.1, which provided that "[t]his subdivision shall not limit the imposition of any other enhancements applicable to that offense . . . ," permitted imposition and execution of sentence on both a weapon enhancement and a great bodily injury enhancement for the same offense. (53 Cal.4th at pp. 165–167.) Although the statutes

provide for the enhancements here, they do not permit specifically the execution of a sentence enhancement as to one count when sentence for the same matter has been imposed and executed on another count or an enhancement on another count. To permit such execution of a sentence enhancement would appear to contravene the purpose and policy of section 654. The question here is whether there can be a sentencing enhancement imposed on one count, when that enhancement is based on the same facts for which defendant was convicted and punished in a different count, without execution of the sentence enhancement being stayed under section 654, and whether defendant's sentence enhancement for the same act that is the basis of the same enhancement alleged in a separate count may be imposed without applying section 654.

In *Ahmed, supra,* 53 Cal.4th 156, at pages 162–163, the court said, "As we noted in *People v. Coronado* [(1995)] 12 Cal.4th [145,] 157 [48 Cal.Rptr.2d 77, 906 P.2d 1232], 'the appellate courts have disagreed on whether section 654 applies to enhancements.' The disagreement persists, although the *modern trend* has been for courts to hold, or at least assume, that section 654 does apply to enhancements that go to the nature of the offense, and then either to apply that section or find that the specific statutes provide an exception to it. (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1218–1221 [109 Cal.Rptr.3d 457] [holding that § 654 precludes imposing the specific enhancement at issue and not deciding the broader question of § 654's application to enhancements in general]; *People v. Chaffer* (2003) 111 Cal.App.4th 1037, 1044–1046 [4 Cal.Rptr.3d 441] [the specific statute operates as an implied exception to § 654]; *People v. Reeves* (2001) 91 Cal.App.4th 14, 54–57 [109 Cal.Rptr.2d 728] [§ 654 does apply to enhancements]; *People v. Arndt* (1999) 76 Cal.App.4th 387, 394–396 [90 Cal.Rptr.2d 415] [§ 654 does apply to enhancements]; *People v. Douglas* (1995) 39 Cal.App.4th 1385 [46 Cal.Rptr.2d 534] [§ 654 does apply to enhancements].)" (Italics added.)

In *People v. Douglas, supra,* 39 Cal.App.4th 1385, one of the cases cited by the court in *Ahmed, supra,* 53 Cal.4th at pages 162 through 163, the defendant was sentenced, inter alia, for the crimes of kidnapping to commit robbery (§ 209, subd. (b)) (count 1), forcible oral copulation (§ 288a, subd. (c)) (count 3), and forcible rape (§ 261, subd. (a)(2)) (count 4). (*People v. Douglas, supra,* 39 Cal.App.4th at p. 1391.) On counts 3 and 4, the trial court imposed sentence on enhancements for kidnapping for the purpose of committing sexual offenses (§ 667.8, subd. (a)), but did not stay execution of sentence on them. In holding that execution of kidnapping sentence enhancements should be stayed pursuant to section 654 based upon the defendant's sentencing for the substantive crimes, the court stated, "[T]he trial court had no grounds to punish defendant again for the identical kidnapping. . . . [¶] . . . [¶] . . . There was only one kidnapping; the kidnapping for robbery was the same as the kidnapping which gave rise to the two enhancements." (*Douglas,* at pp. 1394–1395.)

Section 654 applies to great bodily injury enhancements imposed for a victim who is also the victim alleged in separate counts that are not stayed under section 654. (See, e.g., *People v. Reeves, supra,* 91 Cal.App.4th at pp. 56–57.) We believe that under the "modern trend" (*Ahmed, supra,* 53 Cal.4th at p. 162), section 654 applies to certain enhancements imposed here.

### (b) *Count 1 Enhancements Based on Defendant Inflicting Great Bodily Injury on Medina and Santee*

The jury found true the allegations in count 1 that defendant inflicted great bodily injury on both Medina and Santee in the commission of the gross vehicular manslaughter of Rocha. Section 12022.7, subdivision (a) provides that, "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

Substantial evidence supports the jury's findings that defendant inflicted great bodily injury on others in the commission of the gross vehicular manslaughter of Rocha (see discussion in pt. (d), *post*). Both Rocha and Medina were struck by defendant's vehicle upon the initial impact, and Santee was twice struck by defendant's vehicle—upon initial impact and when defendant left the scene of the accident.

On count 1, the trial court imposed two 3-year sentence enhancements pursuant to section 12022.7, subdivision (a), but stayed execution of sentence on that count, including the sentence enhancements. Although, as noted above, the trial court erred in staying execution of sentence on count 1, execution on the great bodily injury sentence enhancements must be stayed. As to Santee's injuries, defendant was sentenced on count 9 (the second degree murder of Santee) for defendant's acts causing those injuries—a homicide victim "obviously . . . suffer[s] great bodily injury" (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1168 [123 Cal.Rptr.2d 322]). As to Medina, as discussed below, the trial court did not err by enhancing the sentence on count 9 based on great bodily injury to him and, therefore, defendant has already been sentenced for his conduct causing Medina's injury. (§ 654, subd. (a); see *Ahmed, supra,* 53 Cal.4th at p. 162; *People v. Julian* (2011) 198 Cal.App.4th 1524, 1531 [131 Cal.Rptr.3d 561].)

Section 12022.7, subdivision (a) provides that in addition to the punishment for the underlying felony, defendant "shall be punished" for inflicting great bodily injury in the commission of that felony. Subdivision (h) also provides that the court "shall impose" the additional terms of imprisonment. Such language requiring sentencing does not compel imposing and

executing on a sentence enhancement as to one count when sentence for the same matter has been imposed and executed on another count or on an enhancement on another count.

### (c) *Count 7 Enhancement Based on Defendant Inflicting Great Bodily Injury on Santee*

The jury found true the allegations that defendant inflicted great bodily injury on Santee in the commission of the crime of leaving the scene of an accident alleged in count 7. Substantial evidence supports the jury's findings that defendant inflicted great bodily injury on Santee in the commission of leaving the scene of an accident (see discussion in pt. (d) *post*). Santee was struck by defendant's vehicle when defendant left the scene of the accident.

On count 7, the trial court imposed a three-year sentence enhancement pursuant to section 12022.7, subdivision (a), but stayed execution of sentence on that count, including the sentence enhancement. Assuming count 7 is the count for leaving the scene of an accident that is not dismissed by the trial court, execution on the great bodily injury sentence enhancement on count 7 was stayed properly because, as stated *ante*, execution of sentence on count 7 is to be stayed. When the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed. (*People v. Guilford* (1984) 151 Cal.App.3d 406, 411 [198 Cal.Rptr. 700].) It should also be stayed because defendant had been sentenced under count 9—the second degree murder of Santee—for those injuries. (§ 654, subd. (a); see *Ahmed, supra*, 53 Cal.4th at p. 162; *People v. Julian, supra*, 198 Cal.App.4th at p. 1531; *People v. Verlinde, supra*, 100 Cal.App.4th at p. 1168.)

### (d) *Counts 2, 3, 8, and 9 Enhancements Based on Defendant Inflicting Great Bodily Injury on Medina and Rocha*

The trial court enhanced defendant's sentence three years on count 9—the murder of Santee—based on the jury's true finding on the allegation that defendant inflicted great bodily injury on Medina and Rocha in violation of section 12022.7, subdivision (a). The jury also found true the allegations that defendant inflicted great bodily injury on Medina and Rocha in the commission of the gross vehicular manslaughter of Santee in count 2, and leaving the scene of an accident in counts 3 and 8.

Defendant contends that the great bodily injury inflicted on Medina and Rocha did not occur "in the commission" of the crimes specified in counts 2, 3, 8, and 9 because there is insufficient evidence that Medina and Rocha were struck when defendant left the scene of the accident and killed Santee. We disagree.

In *People v. Jones* (2001) 25 Cal.4th 98 [104 Cal.Rptr.2d 753, 18 P.3d 674], the court held that the use of a deadly weapon within the meaning of section 12022.3 occurs " 'in the commission of' " a specified sex offense "if it occurred *before, during, or after* the technical completion of the felonious sex act." (25 Cal.4th at p. 110.) The court analogized the felony-murder statutes with a weapons-use enhancement in that case, and stated, "We long ago rejected the assumption 'that to bring a homicide within the terms of section 189 . . . , the killing must have occurred "while committing," "while engaged in," or "in pursuance" of the named felonies, and that the killing must have been "a part of" the felony or attempted felony "in an actual and material sense." ' [Citation.]" (*Id.* at pp. 108–109.) Determining whether a killing occurred during the commission of a felony "is not ' "a matter of semantics or simple chronology." ' Instead, 'the focus is on the relationship between the underlying felony and the killing.' [Citation.]" (*Id.* at p. 109.)

The court in *People v. Alvarado* (2001) 87 Cal.App.4th 178 [104 Cal.Rptr.2d 624], in discussing " 'in the perpetration of' " a crime, drew an analogy to felony-murder statutes and stated that the California Supreme Court "has repeatedly rejected interpretations that would place technical limits on the scope of the phrase or require a strict causal relationship between the underlying felony and the homicide. Instead, the court has consistently held that a homicide is committed *in the perpetration of* a felony if the killing and felony are parts of 'one continuous transaction,' and this transaction may include flight after the felony to a place of temporary safety. [Citations.]" (*Id.* at pp. 187–189; see *People v. Masbruch* (1996) 13 Cal.4th 1001, 1006–1014 [55 Cal.Rptr.2d 760, 920 P.2d 705] [§ 12022.3, subd. (a) enhancement upheld where the accused only displayed a handgun one hour before the rape]; *People v. Frausto* (2009) 180 Cal.App.4th 890, 903 [103 Cal.Rptr.3d 231] [§ 12022.53, subd. (d) enhancement upheld where shooting of two witnesses aided in the escape from the commission of a murder]; *People v. Mixon* (1990) 225 Cal.App.3d 1471, 1488 [275 Cal.Rptr. 817] [potential § 12022.7 liability arises even for injuries sustained after the victim is removed from her residence after a burglary].)

■■ " '[I]n the commission of' has been given an expansive, not a tailored meaning." (*People v. Frausto, supra*, 180 Cal.App.4th at p. 900.) " '[I]n the commission of' is not the same as 'while committing,' 'while engaged in,' or 'in pursuance.' Temporal niceties are not determinative and the discharge of a gun before, during, or after the felonious act may be sufficient if it can fairly be said that i[t] was a part of a continuous transaction." (*Id.* at p. 902; compare with *People v. Valdez* (2010) 189 Cal.App.4th 82, 90 [116 Cal.Rptr.3d 670] ["the injuries sustained in the accident in this case were not inflicted *in the commission of* a felony or attempted felony based upon defendant's subsequent flight. [¶] This is not to say a great bodily injury allegation may never attach to a violation of section

20001, subdivision (a)."].) Here, a reasonable trier of fact could find that the infliction of great bodily injury on Medina and Rocha and defendant's act of leaving the scene of the accident and running over Santee were part of one continuous transaction. All three victims were simultaneously struck—no doubt within a fraction of a second—by the initial impact of defendant's vehicle. The entire scenario, from the initial impact to defendant leaving the scene of the accident and thereby running over Santee[8] occurred over a period of no more than a few minutes.

Defendant's reliance on *People v. Arzate* (2003) 114 Cal.App.4th 390 [7 Cal.Rptr.3d 680] is unavailing. There, the defendant shot and seriously injured a sheriff's deputy. The court held that "it is logically inconsistent to inflict great bodily injury and use a gun 'in the commission' of the offense of carrying a concealed firearm in a vehicle." (*Id.* at p. 392.) The court reasoned that the offense of carrying the concealed firearm ended when defendant displayed and used the gun. (*Ibid.*) The court distinguished crimes that are committed by a single passive act from those that involve affirmative acts, stating "the offense of carrying a concealed firearm in a vehicle is committed with the single passive act of carrying the firearm in a concealed fashion in a vehicle. In contrast, crimes such as felony murder, burglary, robbery and kidnapping involve affirmative actions, even beyond the initial physical act of entry or taking." (*Id.* at pp. 400–401, fn. omitted.) Unlike the act of carrying a concealed firearm in a vehicle, here the act of inflicting great bodily injury was an affirmative act.

Based on those authorities, there is sufficient evidence to support the jury's true finding that the great bodily injury that defendant inflicted on Medina was in the commission of the offenses alleged in count 2 (the gross vehicular manslaughter of Santee), count 3 (leaving the scene of an accident), and count 9 (the second degree murder of Santee). There is also sufficient evidence to support the jury's true finding that the great bodily injury inflicted on Rocha was in the commission of the offenses alleged in count 2 (the gross vehicular manslaughter of Santee), count 8 (leaving the scene of an accident), and count 9 (the second degree murder of Santee). The trial court did not err by enhancing the sentence on count 9 (the second degree murder of Santee) based on great bodily injury to Medina, but erred by not staying the sentence enhancement on that count as to Rocha's great bodily injury.

As to Medina, on counts 2 and 3, the trial court imposed upon defendant a three-year sentence enhancement pursuant to section 12022.7, subdivision (a) based on great bodily injury suffered by him, but stayed execution of those

---

[8] The prosecutor argued at trial that defendant killed Santee after the initial impact with defendant's vehicle, when defendant backed his vehicle over Santee while leaving the scene of the accident.

counts, including the sentence enhancements. Execution on the great bodily injury sentence enhancement on count 2 was stayed properly because, as stated *ante*, the trial court properly stayed execution of sentence on count 2. (*People v. Guilford, supra*, 151 Cal.App.3d at p. 411.) In addition, the trial court enhanced defendant's sentence on count 9 based on the great bodily injury to Medina. Defendant, therefore, had already been punished for his act that caused Medina's injury. (§ 654, subd. (a); see *Ahmed, supra*, 53 Cal.4th at p. 162; *People v. Julian, supra*, 198 Cal.App.4th at p. 1531.) Assuming count 3 for leaving the scene of an accident is not dismissed by the trial court, execution on the section 12022.7, subdivision (a) sentence enhancement for count 3 must be stayed because, as discussed above, execution of sentence on count 3 should be stayed. (*People v. Guilford, supra*, 151 Cal.App.3d at p. 411.) It should also be stayed because the trial court enhanced defendant's sentence on count 9 based on great bodily injury to Medina.

As to Rocha, on each of counts 2, 8, and 9, the trial court imposed upon defendant a three-year sentence enhancement pursuant to section 12022.7, subdivision (a) based on great bodily injury suffered by him. The trial court stayed execution of sentence on counts 2 and 8, including the sentence enhancements, and executed sentence on count 9, including the sentence enhancement.

Execution on the great bodily injury sentence enhancement on count 2 based on Rocha's injury was stayed properly because, as stated above, the trial court properly stayed execution of sentence on count 2. (*People v. Guilford, supra*, 151 Cal.App.3d at p. 411.) And assuming the trial court selects count 8 as the leaving the scene of an accident count that is not to be dismissed, execution on the section 12022.7, subdivision (a) sentence enhancement for that count must be stayed because, as discussed above, execution of sentence on count 8 should be stayed. (*People v. Guilford*, at p. 411.) It should also be stayed because execution of the sentence on count 1, the gross vehicular manslaughter of Rocha, is not to be stayed, and defendant will be sentenced for his act in causing Rocha's great bodily injury. (§ 654, subd. (a); see *Ahmed, supra*, 53 Cal.4th at p. 162; *People v. Julian, supra*, 198 Cal.App.4th at p. 1531; *People v. Verlinde, supra*, 100 Cal.App.4th at p. 1168.) For this same reason, the trial court erred by not staying the sentence enhancement on count 9 as to Rocha's great bodily injury.

### (e) *Counts 1 and 2 Enhancements Based on Defendant Fleeing the Scene of the Crime*

The jury found true the enhancement allegations as to counts 1 and 2 that defendant fled the scene of a crime pursuant to Vehicle Code section 20001, subdivision (c). Vehicle Code section 20001, subdivision (c) provides in relevant part, "A person who flees the scene of the crime after committing a

violation of . . . Section 192 of the Penal Code, upon conviction of [that section], in addition and consecutive to the punishment prescribed, shall be punished by an additional term of imprisonment of five years in the state prison." There is substantial evidence to support the jury's true findings.

On each of counts 1 and 2, the trial court imposed a five-year sentence enhancement pursuant to Vehicle Code section 20001, subdivision (c), but stayed execution of sentence on those counts, including the sentence enhancements. Execution of sentence on the Vehicle Code section 20001, subdivision (c) enhancement on count 2 was stayed properly because, as stated above, the trial court properly stayed execution of sentence on count 2 (*People v. Guilford, supra,* 151 Cal.App.3d at p. 411).

Vehicle Code section 20001, subdivision (c) provides that upon conviction of a crime in violation of Penal Code section 192, "in addition and consecutive to the punishment prescribed, [the defendant] *shall be punished* by an additional term of imprisonment of five years in the state prison." (Italics added.) This mandatory language, however, does not address the propriety of imposing and executing on a sentence enhancement as to one count when sentence for the same matter has been imposed and executed on another count or an enhancement on another count. That is, it does not preclude section 654 from requiring that execution on the sentence enhancement be stayed because of the imposition and execution of sentence on the substantive crime in another count.

Nevertheless, the fleeing the scene of a crime enhancement pursuant to Vehicle Code section 20001, subdivision (c) alleged in count 1, as discussed above, provides a greater penalty than the sentences on each of counts 3, 7, or 8, for leaving the scene of an accident offenses pursuant to Vehicle Code section 20001, subdivision (a). Execution on the sentence enhancement in count 1 therefore should not be stayed, and execution on whichever of counts 3, 7, or 8 that remains must be stayed instead.

### (f) Count 9 Enhancement Based on Defendant Fleeing the Scene of a Crime

The trial court enhanced defendant's sentence five years on count 9 for the second degree murder of Santee based on defendant fleeing the scene of a crime in violation of Vehicle Code section 20001, subdivision (c). The trial court erred.

Vehicle Code section 20001, subdivision (c) imposes a five-year enhancement if a defendant is convicted of a violation of Penal Code section 191.5 (gross vehicular manslaughter while intoxicated) or 192, subdivision (c)(1)

(gross vehicular manslaughter). Defendant's conviction on count 9 was for a violation of section 187, subdivision (a) (murder), not for violations of section 191.5 or 192, subdivision (c)(1). In addition, it was not alleged in count 9 that defendant fled the scene of a crime in violation of Vehicle Code section 20001, subdivision (c). The enhancement allegation of fleeing the scene of a crime was only charged in counts 1 and 2.

### 3. *Presentence Conduct Credits*

The trial court erred in crediting defendant with 855 days of custody credit consisting of 744 days of actual custody credit and 111 days of conduct credit. Section 2933.2 provides in relevant part: "(a) Notwithstanding Section 2933.1 or any other law, any person who is convicted of murder, as defined in Section 187, shall not accrue any credit, as specified in Section 2933. [¶] . . . [¶] (c) Notwithstanding Section 4019 or any other provision of law, no credit pursuant to Section 4019 may be earned against a period of confinement in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest for any person specified in subdivision (a)." (See *People v. Moon* (2011) 193 Cal.App.4th 1246, 1249–1253 [123 Cal.Rptr.3d 448]; *People v. Herrera* (2001) 88 Cal.App.4th 1353, 1366 [106 Cal.Rptr.2d 793].) Because defendant was convicted of murder pursuant to section 187, the trial court erred in awarding him 111 days of presentence conduct credits.

### 4. *Criminal Conviction Assessment*

 The trial court was required to impose a $30 criminal conviction assessment as to each count on which defendant was convicted. (*People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3 [106 Cal.Rptr.3d 688]; Gov. Code, § 70373, subd. (a)(1); see *People v. Lopez* (2010) 188 Cal.App.4th 474, 480 [115 Cal.Rptr.3d 477].) The trial court orally imposed such an assessment on each of the counts on which defendant was convicted, for a total amount of $180, but the abstract of judgment incorrectly reflects only a $30 criminal conviction assessment. Accordingly, the abstract of judgment should reflect a criminal conviction assessment of $180.

## DISPOSITION

We reverse the judgment as to the stay of execution of sentence on count 1, including the fleeing the scene of a crime enhancement pursuant to Vehicle Code section 20001, subdivision (c); the imposition of the Vehicle Code section 20001, subdivision (c) sentence enhancement on count 9; the failure to stay execution of the Penal Code section 12022.7, subdivision (c) sentence enhancement for Rocha's great bodily injury on count 9; and defendant's

award of 111 days of presentence conduct credit. The matter is remanded to the trial court for resentencing, considering all sentencing choices consistent with this opinion. Upon remand, the trial court is to impose and not stay execution of sentence on count 1, and stay execution of the Penal Code section 12022.7, subdivision (c) sentence enhancement on that count, but not stay execution of the Vehicle Code section 20001, subdivision (c) sentence enhancement on that count; select one leaving the scene of an accident count from counts 3, 7, and 8, stay execution of sentence on that count, including the section 12022.7, subdivision (c) sentence enhancement, and, pursuant to section 1385, subdivision (a), dismiss the remaining two leaving the scene of an accident counts; and stay execution of the section 12022.7, subdivision (c) sentence enhancement for Rocha's great bodily injury on count 9. The abstract of judgment is to reflect a criminal conviction assessment of $180 and that defendant is credited with 744 days of custody credit consisting of 744 days of actual custody credit. In all other respects, the judgment is affirmed.

Turner, P. J., and Armstrong, J., concurred.

The petitions of both respondent and appellant for review by the Supreme Court were denied January 23, 2013, S206609.