Filed 8/22/16  P. v. Berry CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B262964 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA397700) |
| v. | |
| RAYMOND GLEN BERRY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Modified and remanded with directions.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

A jury convicted defendant, Raymond Glen Berry, of: firearm assault (Pen. Code, § 245, subd. (a)(2))[1] (count 2); first degree burglary (§ 459) (count 3); child abuse (§ 273a, subd. (a)) (count 5); firearm and ammunition possession by a felon (§§ 29800, subd. (a)(1), 30305, subd. (a)(1)) (counts 6 and 7); and semiautomatic firearm assault (§ 245, subd. (b)) (count 8). The jury further found, as to counts 2 and 3, that defendant personally inflicted great bodily injury on the victim. (§ 12022.7, subd. (a).) And, as to counts 2 through 5 and 8, the jury found defendant personally used a handgun. (§ 12022.5, subd. (a).) The trial court found defendant had previously sustained two prior convictions within the meaning of sections 667, subdivision (a)(1) and 1170.12, subdivision (b). In addition, the trial court found that defendant had served two prior prison terms. Defendant was sentenced to 25 years to life in state prison plus 17 years. We modify the judgment and, upon remittitur issuance, the trial court is to recompute defendant's presentence credits.

## II. THE EVIDENCE

On April 19, 2012, Eric Kennon lived with Adrian Sims. Ms. Sims was the mother of Mr. Kennon's two-year old son. The three of them lived in the same apartment. Defendant is Ms. Sims's brother. Until about a week earlier, defendant had also lived in the apartment. Defendant moved out of the apartment after an argument with Ms. Sims and Mr. Kennon over household issues. On the afternoon of April 19, 2012, Mr. Kennon was in a bedroom with the two-year-old. Defendant walked in holding a black semiautomatic handgun. Defendant pointed the gun at Mr. Kennon's head and said, "You talking shit about me to my folks?" Mr. Kennon took a step toward defendant and responded, "I don't even talk to your folks." Defendant said, "Nigga what?" and he cocked the gun. Mr. Kennon jumped on defendant. Mr. Kennon then grabbed defendant's wrist. Mr. Kennon said, "What the fuck are you doing?" A struggle ensued

---

[1] Further statutory references are to the Penal Code except where otherwise noted.

during which defendant twice fired his weapon. Defendant broke free, pointed the gun straight at Mr. Kennon and fired again. Mr. Kennon said, "Motherfucker you just shot me." Defendant walked out of the bedroom. Two .40-caliber casings were located in Mr. Kennon's bedroom. There were no bullet holes in the bedroom walls or ceiling. No handgun was found in the apartment. At trial, Mr. Kennon testified that neither he nor Ms. Sims had a gun in their residence.

Ms. Sims's son, Richard Nichols, was in the living room playing video games when defendant entered the apartment armed with a handgun. Defendant went immediately upstairs without speaking to Mr. Nichols. Mr. Nichols heard defendant and Mr. Kennon arguing. Mr. Nichols heard people wrestling followed by two gunshots and then he ran out of the apartment. Mr. Nichols saw Mr. Kennon walking slowly down the steps. Mr. Kennon had blood on his abdomen and hands. Mr. Nichols called an emergency operator and said in part: "Can you come to 1617 East 53rd Street? You got to arrest a man named Raymond Berry. Can they put that man in jail for life because he just shot my stepdad and my little brother in his bedroom." An audio recording of the entirety of the telephone call was introduced at trial. At trial, however, Mr. Nichols denied he was home at the time and making the emergency telephone call. In rebuttal, Detective Brendy Ponce testified the caller sounded like Mr. Nichols. Detective Ponce had previously interviewed Mr. Nichols. Moreover, according to Detective Ponce, the caller's telephone number matched that of Mr. Nichols.

Mr. Kennon testified he sustained two abdominal wounds requiring surgery. The surgeon made a 12-inch incision from Mr. Kennon's upper to lower abdomen. Mr. Kennon did not remember how long he was hospitalized, but he thought it was several weeks. He had to learn to walk again. He was still in pain. The defense presented evidence: Mr. Kennon was shot once but the bullet caused two wounds; Mr. Kennon was hospitalized for only three days; and he was fully ambulatory following the surgery. It was undisputed a bullet remained lodged near Mr. Kennon's right buttock.

There was evidence defendant was also injured during the fight. In the immediate aftermath of the shooting, Mr. Kennon saw blood on the kitchen floor. Mr. Kennon saw

3

defendant limping away from the bedroom. Defendant showed his left foot to the jury. Defense counsel stated: "I'm showing the left foot on the right-hand side there appears to be a scar, an indentation-type scar that's perhaps three inches or so long, maybe a bit longer."

Mr. Kennon relocated with police department assistance after he was shot. When he returned to California shortly before trial, he was homeless. He stole food from grocery stores to survive. Mr. Kennon had also received assistance from Deputy District Attorney Ian Phan. Mr. Phan had taken Mr. Kennon to lunch. Also, Mr. Phan had paid Mr. Kennon's cellular telephone bill so they could stay in contact. And, Mr. Phan had given Mr. Kennon a gift card which could be used to purchase food.

Mr. Kennon admitted he had sustained a prior felony conviction for a carjacking during which he used a "replica" gun. He denied stealing money from an Albertsons grocery store while working there. Mr. Kennon admitted, however, that in 2005 he had been accused of the theft while working at the grocery store. In addition, Mr. Kennon had argued with the manager and was later terminated. Mr. Kennon and Mr. Phan, the deputy district attorney, had discussed the termination. In that conversation, Mr. Kennon admitted getting into a fight with the store manager. The defense presented evidence Mr. Kennon was fired for stealing approximately $485 worth of merchandise. But the evidence presented by the defense failed to demonstrate an argument or fight occurred between Mr. Kennon and the manger.

Mr. Kennon testified at length about a 2006 fight with Dorian Lewis, the father of Ms. Sims's three older children. Mr. Lewis had attacked Mr. Kennon with a knife. Mr. Lewis pled guilty to the crime and went to prison. Also, Mr. Kennon fought with Mr. Nichols on multiple occasions. One of the fights occurred when Mr. Kennon was 16 years old. Mr. Nichols was scratched by one of his eyes. On a different day, Mr. Kennon bit Mr. Nichols on the face. Brandon Terrazas, an emergency medical technician, treated 16-year-old Mr. Nichols on July 18, 2013. Mr. Nichols had sustained a more than one-inch laceration above his right eyebrow as a result of a fight.

4

## III.  DISCUSSION

### A.  Impeachment Evidence

The defense sought to show Mr. Kennon was not credible *and* was the likely aggressor in the altercation with defendant.  To that end, the defense unsuccessfully sought to introduce additional impeachment evidence.  The proffered evidence was aimed in large part at demonstrating Mr. Kennon had a "practice" of putting guns to victims' heads.  According to the defense, a reasonable inference could be made Mr. Kennon did so in this case as well.  Defendant's trial attorney, Deputy Public Defender Erin Muse, argued the proffered evidence would "go to Mr. Kennon's M.O" in her words.  She said that *if* defendant testified, he would say, "Mr. Kennon put a gun to his head as he entered the room."  Ms. Muse at another point argued, "[I]t's very clear it's the People's theory that my client had the gun as opposed to Mr. Kennon and I think at any other time Mr. Kennon had a gun and used a gun it should be admissible and I think I'm not getting that anyplace else in the impeachment I've been allowed to use thus far."  The trial court responded:  "I think what you're trying to do is get in self-defense through this handgun situation.  It's kind of back-dooring it and I don't see how you get in self-defense . . . without Mr. Berry testifying."  The trial court also noted impeachment evidence going to Mr. Kennon's veracity did not raise an inference that defendant acted in self-defense; "That's not a leap you can make."  Defendant argues it was prejudicial error to exclude the evidence.  We find no abuse of discretion under Evidence Code section 352.

First, defendant sought to present evidence concerning the carjacking which resulted in Mr. Kennon's felony conviction.  During the incident, Mr. Kennon approached a child sitting alone in a car and placed a fake gun to her head.  The trial court declined to retry the carjacking case.  It did allow defense counsel to ask Mr. Kennon whether he had used a "replica" gun.

Second, defendant proffered evidence Mr. Kennon was suspected of having committed an armed robbery of an Albertsons grocery store in 2005.  The robbery occurred after Mr. Kennon had been fired.  The masked robber, who appeared on a surveillance videotape, bore a physical resemblance to Mr. Kennon.  The individual was

5

armed and pointed his weapon at victims' heads. One victim had worked closely with Mr. Kennon. This victim believed the robber had Mr. Kennon's unusual gait and mannerisms. The victim did not see the perpetrator's face. Nor did the victim hear the robber speak. The store manager had viewed the surveillance videotape and was certain Mr. Kennon was the robber. And Mr. Kennon's fingerprints were found on items the robber had touched. The trial court concluded the probative value of the evidence was diminished since it was unknown whether defendant was the perpetrator. Moreover, in the trial court's view, the jury would be confused by the "mini-trial." The trial court ruled: "What I'm really concerned about is that it's going to confuse the jury. They are not going to know what to do with the evidence. How to assess it, what import. They are going to wonder why are we talking about a robbery when this case is about an attempted murder so because I think it's highly confusing." (The jury was unable to reach a verdict on the attempted murder count.)

Third, the defense made an offer of proof that as a juvenile Mr. Kennon committed a theft related offense. Ms. Muse stated, "There was a theft related [offense] of stealing a woman's purse and then the car I believe if memory serves the keys to the car were in the purse then the car is stolen then Mr. Kennon is found in the car after." There was no indication the juvenile petition had been sustained. The trial court concluded the misconduct was too remote. Mr. Kennon was 51 years old at the time of trial.

The trial court expressly ruled pursuant to Evidence Code section 352. We review the trial court's Evidence Code section 352 rulings for an abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 578; *People v. Chatman* (2006) 38 Cal.4th 344, 373-374; *People v. Cole* (2004) 33 Cal.4th 1158, 1195; *People v. Wheeler* (1992) 4 Cal.4th 284, 297 (*Wheeler*).) Our Supreme Court has held: "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason."' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 663.) Our Supreme Court has further held, "A trial court's exercise of discretion under [Evidence Code] section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v.*

6

*Williams* (2008) 43 Cal.4th 584, 634–635; [*People v.*] *Rodrigues* [(1994)] 8 Cal.4th [1060,] 1124–1125.)" (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

A rational inference can be made that a witness who has committed acts involving moral turpitude is more likely to be dishonest than one who has not. (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24; *Wheeler, supra*, 4 Cal.4th at p. 295.) Our Supreme Court has held "Moral turpitude" means a "'general readiness to do evil.'" (*People v. Castro* (1985) 38 Cal.3d 301, 314 [lead opn. of Kaws, J.]; accord, *People v. Contreras, supra*, 58 Cal.4th at p. 157, fn. 24.) Our Supreme Court has held, "Misconduct involving moral turpitude may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction." (*Wheeler, supra*, 4 Cal.4th at pp. 295-296; see *People v. Rivera* (2003) 107 Cal.App.4th 1374, 1380.) The admission of such evidence is subject, however, to exclusion under Evidence Code section 352. (*People v. Lucas* (2014) 60 Cal.4th 153, 240, disapproved on another point in *People v. Romero* (2015) 62 Cal.4th 1, 53, fn. 19; *Wheeler, supra,* 4 Cal.4th at pp. 95-296.) Moreover, our Supreme Court has explained: "[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statue empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues. . . . [¶] When exercising its discretion under Evidence Code section 352, a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area. [Citations.] But additional considerations may apply when evidence other than felony convictions is offered for impeachment. In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler, supra*, 4 Cal.4th at pp. 296-297; accord, *People v. Contreras, supra*, 58 Cal.4th at p. 157, fn. 24; *People v. Chatman, supra*, 38 Cal.4th 344, 373.) As

7

our Supreme Court observed in *Contreras,* "[T]rial courts have broad discretion to exclude impeachment evidence other than felony convictions where such evidence might involve undue time, confusion, or prejudice." (*People v. Contreras, supra*, 58 Cal.4th at p. 157, fn. 24; see *Wheeler, supra*, 4 Cal.4th at pp. 296-297.)

No abuse of discretion occurred. The trial court could reasonably conclude the time consuming introduction of additional evidence as to the carjacking would add little probative value in light of the existing impeachment evidence. The jury knew Mr. Kennon had been convicted of a felony and had used a "replica" gun in the commission of the offense. Without abusing its discretion, the trial court could reasonably conclude the introduction of further underlying facts also had the potential to distract the jury. Turning to the Albertsons robbery, Mr. Kennon was never charged with, much less convicted of, that crime. To prove the circumstances of the Albertsons robbery and the facts connecting Mr. Kennon to that crime would have consumed significant time. The probative value of that evidence was undercut by the absence of conviction. And the jury would have been confused by attempts to try Mr. Kennon for the crime which was unrelated to the present shooting. Moreover, as the trial court repeatedly observed, evidence Mr. Kennon used a gun or may have used one on previous occasions did not raise an inference he was lying about who shot him. Nor would it support an inference that Mr. Kennon was the one with the gun and defendant acted in self-defense. With respect to the alleged juvenile misconduct, Mr. Kennon was 51 years old at the time of trial. The proffered juvenile theft had minimal probative value given that it had occurred many years earlier. Additionally, there was no indication a juvenile petition had been sustained. The trial court could reasonably conclude introducing evidence as to the Albertsons robbery and the juvenile misconduct would require an undue consumption of time while confusing the issues. The trial court's rulings were within the bounds of reason and thus no abuse of discretion occurred.

It was long settled in California that when a witness is impeached with a prior felony conviction, the scope of inquiry does not extend to the details and surrounding circumstances of the offense. (*People v. Smith* (2003) 30 Cal.4th 581, 634; *People v.*

*McClellan* (1969) 71 Cal.2d 793, 809; *People v. Schader* (1969) 71 Cal.2d 761, 773; *People v. Smith* (1966) 63 Cal.2d 779, 790; *People v. Braun* (1939) 14 Cal.2d 1, 6; *People v. David* (1939) 12 Cal.2d 639, 646; *People v. Eldridge* (1905) 147 Cal. 782, 786-787; *People v. Chin Hane* (1895) 108 Cal. 597, 606-607; *People v. Ardoin* (2011) 196 Cal.App.4th 102, 120; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 842; *People v. Shea* (1995) 39 Cal.App.4th 1257, 1267.) Defendant argues the 1982 "Truth-In-Evidence" amendment to the California Constitution (art. I, § 28, subd. (f)) abrogated the categorical bar on impeachment with a felony conviction's underlying circumstances. Article 1, section 28, subdivision (f)(2) of the California Constitution provides in part: "[R]elevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103." In *In re Freeman* (2006) 38 Cal.4th 630, 640, our Supreme Court held, "[A]rticle 1, section 28, subdivision (d) [now (f)] of the California Constitution 'supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of section 28(d) . . . ." The trial court did not categorically exclude the underlying facts of Mr. Kennon's carjacking conviction. Instead, the court expressly ruled under Evidence Code section 352. (*People v. Ardoin, supra*, 196 Cal.App.4th at p. 120; see *People v. Sapp* (2003) 31 Cal.4th 240, 289-290.)

Defendant raises a federal constitutional claim, "Not only did the exclusion of the proffered evidence amount to an abuse of discretion, it also implicated [defendant's] federal constitutional rights to confront the witnesses against him and to present a defense." Defendant did not specifically assert a federal constitutional right violation in the trial court. (*People v. Riggs* (2008) 44 Cal.4th 248, 292; *People v. Partida* (2005) 37 Cal.4th 428, 437.) However, as our Supreme Court held in *Riggs,* "To the extent any constitutional claim is merely a gloss on the objection raised at trial, it is preserved but is without merit because the trial court did not abuse its discretion in [declining to admit]

9

the evidence. [Citation.]" (*People v. Riggs, supra*, 44 Cal.4th at p. 292; see *People v. Fuiava, supra*, 53 Cal.4th 622, 670.) Moreover, as our Supreme Court has also held, "[R]eliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545; accord, *People v. Ardoin, supra,* 196 Cal.App.4th at p. 122.) No violation of defendant's federal constitutional rights occurred.

B.   Ineffective Assistance of Counsel

Defendant asserts his trial counsel was ineffective for failing to make a hearsay objection to statements Mr. Nichols made to the emergency operator. During the call, Mr. Nichols repeatedly said defendant had "shot my stepdad." The emergency operator told Mr. Nichols: "Slow down. Slow down . . . you['re] yelling." Defendant argues the statements were inadmissible as spontaneous statements because Mr. Nichols did not personally witness the shooting. We disagree.

Pursuant to Evidence Code section 1240: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." It is possible to perceive an event without witnessing it. Our Supreme Court has held: "The Evidence Code does not use the term 'witnessed by.' Rather, it refers to an act, condition, or event 'perceived by' the declarant. (Evid. Code, § 1240, subd. (a).) . . . [I]n *People v. Poggi* (1988) 45 Cal.3d 306, [318,] the court noted spontaneous statements may include the ""'sincere expression'"" of the speaker's ""'actual impressions and belief.'"" [Citation.] [¶] There are many ways someone can acquire the personal knowledge required to support a conclusion that the person perceived an event. [Here,] [the declarant] saw defendant enter her room and leave. Shortly thereafter, she heard [her daughter say she had heard a gunshot and that she was going to check the house] followed by a gunshot. [The declarant] emerged from her room to see [her daughter] fall, bleeding. [The declarant] was understandably

10

traumatized by what she perceived:  a shooting in her home, her daughter . . . lying on the floor mortally injured.  These observations were clearly relevant to the circumstances of the shooting.  Nothing indicated [the declarant] was insincere in her quite logical belief that defendant had shot the victims.  At best, the issue of whether [the declarant] actually saw defendant fire the shots went to the weight of her statements, not their admissibility.  [Citation.]  Accordingly, [the declarant's] statements to both [her neighbor] and [a police officer] properly qualified as spontaneous statements." (*People v. Blacksher* (2011) 52 Cal.4th 769, 810-811.)

Similarly, Mr. Nichols was in the living room when the shooting occurred in an upstairs bedroom.  Mr. Nichols saw defendant enter the home with a gun and walk upstairs.  Mr. Nichols heard the sounds of the two men arguing and then wrestling.  He heard the gunshots.  Mr. Nichols saw Mr. Kennon bleeding and immediately telephoned an emergency operator.  The emergency operator had to tell Mr. Nichols, "Slow down . . . you['re] yelling."  Mr. Nichols statements to the emergency operator were spontaneous. (Evid. Code, § 1240; *People v. Blacksher, supra*, 52 Cal.4th at pp. 810-811; see also *People v. Rolbal* (1998) 19 Cal.4th 481, 516-517 [caller had just discovered his murdered wife's body].)  A hearsay objection in all eventualities would have been overruled. Counsel was not ineffective for failing to make a futile objection.  (*People v. Thompson* (2010) 49 Cal.4th 79, 122; *People v. Memro* (1995) 11 Cal.4th 786, 834.)  Defendant has failed to demonstrate it was reasonably probable that the trial court would have sustained a hearsay objection under these circumstances.  Thus, defendant has failed to sustain his prejudice burden, an essential element of proof concerning an ineffective assistance of counsel claim, concerning the challenged hearsay declaration.  (*In re Champion* (2014) 58 Cal.4th 965, 1007*; In re Crew* (2011) 52 Cal.4th 126, 150.)

Defendant suggests Mr. Nichols's statements were based on what others said rather than on what he actually perceived.  The transcripts of the emergency phone calls, however, do not support such an inference.  There are other two voices, one male and another female, in the background.  Neither of the voices, prompted Mr. Nichols to say it was defendant who shot Mr. Kennon.

11

## C. Cumulative Error

Defendant makes a cumulative error argument. We find no prejudicial legal error. Therefore, we reject defendant's argument the cumulative effect of all the errors requires reversal. (*People v. Jones* (2013) 57 Cal.4th 899, 981; *People v. Edwards* (2013) 57 Cal.4th 658, 746.)

## D. Sentencing

### 1. Prior serious felony enhancement

The information alleges with respect to counts 1 through 7 that defendant had sustained two prior serious felony convictions within the meaning of section 667, subdivision (a)(1). The trial court found the allegations to be true. The trial court imposed what amounted to two section 667, subdivision (a)(1) five-year enhancements. The trial court was required to impose the prior serious felony conviction enhancements to each of the indeterminate terms where he was alleged and imposed; counts 2 and 3. (*People v. Williams* (2004) 34 Cal.4th 397, 401-405; *People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1041; see *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1559.) The parties agree that we should modify the sentence rather than remand for resentencing. Accordingly, we modify the sentence imposed on count 3 by adding two section 667, subdivision (a)(1) five-year enhancements. Because the trial court stayed the court 3 sentence under section 654, subdivision (a), the enhancement is also stayed. (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1221; *People v. Guilford* (1984) 151 Cal.App.3d 406, 411.)

### 2. Custody and conduct credit

The trial court credited defendant with 1,050 days in presentence custody plus 157 days for good conduct. (§ 2933.1, subd. (c).) The trial court commented: "Custody credits I figured those out myself actually. He had 1050 is what the court figured. I put in the date of the incident which I believe was the arrest date and today's date and it told me 1050." Defendant committed the charged offenses on

12

April 19, 2012. There is no substantial evidence that supports the trial court's 1,050 day calculation of presentence custody credits.

The following is the sum total of the circumstances relating to defendant's arrest which are contained in the record on direct appeal. According to the probation report, after he committed the shooting and other offenses, "The defendant then fled to the State of Georgia and was on the run for approximately one year, before being apprehended by the United States Marshall's and later booked by the Los Angeles Police Department." The probation report states defendant was arrested by local authorities on September 19, 2013. However, the probation report also states, "[T]he circumstances of the arrest of the defendant are unknown." Defendant was sentenced on March 5, 2015, a 533-day period after his arrest by unidentified detectives with the Los Angeles Police Department. Thus, nothing in the record on appeal supports the 1,050 day award of presentence custody credits.

Upon remittitur issuance, the trial court is to recalculate defendant's presentence credits. In doing so, the trial court is to determine the date of defendant's arrest by federal authorities. Defendant is entitled to credit for any time spent in custody in Georgia pending extradition to this state. (*In re Martinez* (2003) 30 Cal.4th 29, 40; *In re Watson* (1977) 19 Cal.3d 646, 654.)

### 3. The local crime prevention programs fine

The abstract of judgment reflects a $10 local crime prevention programs fine (§ 1202.5) together with a "$2.00 Criminal Fine Surcharge pursuant to 1465.7 penal code." The trial court never orally imposed such a fine or surcharge. The oral pronouncement of sentence is controlling and any deviation from it in an abstract of judgment constitutes clerical error. (*People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Hartsell* (1973) 34 Cal.App.3d 8, 14.) Moreover, the local crime prevention programs fine is subject to a defendant's ability to pay. (§ 1202.5, subd. (a); *People v. Castellanos* (2000) 175 Cal.App.4th 1524, 1531.) On a silent record, as here, we presume the trial court found defendant did not have the ability to pay the fine. (Cf.

13

*People v. Sharret* (2011) 191 Cal.App.4th 859, 864 [drug program fee]; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1371 [sex offenses fine]; *People v. Turner* (2002) 96 Cal.App.4th 1409, 1413, fn. 2 [drug program fee].)  Accordingly, the amended abstract of judgment shall omit reference to the fine and the associated surcharge.

IV.  DISPOSITION

The sentence is modified to impose a stayed 10-year enhancement on count 3 under Penal Code section 667, subdivision (a)(1).  Upon remittitur issuance, the trial court is to recalculate defendant presentence custody and conduct credit.  The judgment is affirmed in all other respects.  The superior court clerk shall prepare an amended abstract of judgment that:  reflects the modified sentences; sets forth the recalculated presentence custody and conduct credit; and deletes all references to the $10 local crime prevention programs fine and the $2 Penal Code section 1465.7 surcharge.  The superior court clerk shall deliver a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.

We concur:


KRIEGLER, J.


RAPHAEL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14